**PROFESSIONAL INSURANCE MANAGEMENT, Plaintiff–Appellee,**

v.

**THE OHIO CASUALTY GROUP OF INSURANCE COMPANIES, et al., Defendants–Appellants.**

**and**

**Professional Insurance Management, Plaintiff–Appellee,**

v.

**The Ohio Casualty Group Of Insurance Companies, et al., Defendants–Appellants.**

**Nos. CIV.A. 99–5919 (JBS), CIV.A. 00–060 (JBS).
Bankruptcy No. 94–13602.
Adversary No. 94–1312.**

United States District Court, D. New Jersey.

Feb. 29, 2000.

---

Samuel Mandel, Moorestown, NJ and Michael A. Zindler, Markowitz & Zindler,Lawrenceville, NJ for Plaintiff–Appellee.

Carl J. Soranno, Charles X. Gormally, Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, Roseland, NJ for Defendants–Appellants.

**OPINION**

SIMANDLE, District Judge:

## Table of Contents

Introduction ............................................. 52

I. BACKGROUND ...................................... 53

II. DISCUSSION ......................................... 58
 A. Jurisdiction and Standard of Review ................ 58
 1. Appellate Jurisdiction ...................... 58
 2. Standard of Review on Appeal ................ 60
 3. Primary Jurisdiction ........................ 60
 B. Whether PIM Was Terminated At Will or For Cause ...... 62
 C. Recoupment ..................................... 65
 D. Constructive Trust .............................. 68
 E. Interest ........................................ 69
 F. Contempt ....................................... 71

III. CONCLUSION ...................................... 74

*Introduction*

This matter is before this Court on appeals of rulings entered in the Bankruptcy Court, the Honorable Judith Wizmur presiding, in a dispute between an insurance company and its former agent. In opinions dated July 12, 1999 and September 22, 1999, and Orders dated, respectively, July 30, 1999 and October 14, 1999, the Bankruptcy Court ruled that defendants-appellants, The Ohio Casualty Group of Insurance Companies ("Ohio Casualty"), must turn over to plaintiff, Professional Insurance Management ("PIM" or "Debtor"), $216,569.79 in owed commissions, plus additional commissions that continue to be earned. Since that time, the Bankruptcy Court has also ordered that Ohio Casualty also pay interest on that amount and has held Ohio Casualty in contempt for failure to pay over the moneys due by the deadline set by the Bankruptcy Court. Ohio Casualty appeals[1] those orders to this

1. The appeal in Civil Action No. 99–5919(JBS) arises from Ohio Casualty's notice of appeal filed October 25, 1999 in the Bankruptcy Court from the Order of October 14, 1999, including the earlier Order of July 30, 1999. This Court granted leave to Ohio Casualty to amend the notice of appeal to include review of the Bankruptcy Court's Order of January 19, 2000, which directed that Ohio Casualty pay the debtor, PIM, prejudgment interest on commissions accrued from April 1, 1996 through October 14, 1999, which was made final by the Order filed February 17, 2000 in the Bankruptcy Court directing that

Court and asks this Court to reject the Bankruptcy Court's findings of fact and conclusions of law regarding the issue of contempt. For the reasons stated herein, this Court will affirm the Bankruptcy Court's orders to pay over commissions and interest, and this Court vacates the Bankruptcy Court's finding of contempt.

## I. *BACKGROUND*

The facts of this case are set out at length in previous opinions of this Court. Largely, this Court refers the reader to the facts as stated by the Bankruptcy Court in the July 12, 1999 and September 22, 1999 Opinions; though Ohio Casualty disputes some of these facts, upon an independent review of the record, this Court finds that none of the factual findings were clearly erroneous.[2] By way of background for this Opinion, this Court will summarize the most relevant facts and procedural history.

Debtor/Appellee, Professional Insurance Management ("PIM"), is a licensed New Jersey insurance agent that produces both personal and commercial lines of insurance. In 1982, PIM entered into an agency relationship with the Ohio Casualty Group of Insurance Companies and its subsidiaries. Under the Ohio Casualty–

PIM agency agreement, PIM was to market Ohio Casualty's personal and commercial insurance policies by locating customers, determining their insurance needs, and selling them appropriate Ohio Casualty insurance. In the case of personal automobile insurance, Ohio Casualty was to collect premiums directly from the policy holders and then send commissions to PIM. Other premiums, such as those on commercial insurance, were collected by PIM, who sent the money to Ohio Casualty minus the sales commissions. The agency agreement allowed Ohio Casualty to cancel the contract on 90 days notice.

For those insurance premiums which were paid through PIM (personal automobile insurance), Ohio Casualty provided PIM and its other agents with a monthly account statement detailing each insurance account, the type of insurance, the gross premium, the commission rate, and details of the amounts currently due, past due, and due in the future. The statements were compiled on the last day of the month and PIM would receive them at the beginning of the next month. PIM would compare its own records with the statement and reconcile the items in the "currently due" column, placing a check mark next to each item that it would pay or take

Ohio Casualty pay over to the debtor the sum of $228,933.29 in commissions accrued through October 14, 1999 plus $30,382.66 in prejudgment interest on those commissions, for a total of $259,315.95. The parties have agreed that briefing is complete upon the issue of prejudgment interest raised by the amended notice of appeal, and the court finds these matters are now ripe for appellate review.

The appeal in Civil Action No. 00–640(JBS) arises from the Bankruptcy Court's Letter Opinion of November 17, 1999 and Order of November 23, 1999, which imposed sanctions upon Ohio Casualty from contempt of court in the amount of attorneys fees, which were awarded in the Order of December 1, 1999. Ohio Casualty's objections to the contempt findings pursuant to Fed. R. Bank. P. 9020(c) were filed in the Bankruptcy Court on December 3, 1999, and PIM's response thereto was filed thereafter under Fed. R. Bank. P. 9033(b), and these were transmitted to the District Court for de novo review under Fed.

R. Bank. P. 9033(d) and docketed in this Court. These two appeals (99–cv–5919 and 00–cv640) were consolidated by this Court's Order of February 15, 2000, and this Opinion addresses all issues raised in both appeals.

**2.** As more fully explained below, this Court finds that the Bankruptcy Court did err in determining that the effective date of PIM's termination as an agent was November 15, 1993, the date upon which Notice of Termination was sent, instead of March 1, 1994, the stated date of termination. That is not an error of fact, but an error of law, for the effective date of the termination as stated in the letter could not have been less than ninety days after November 15, 1993, by operation of statute. As also explained below, this error is harmless in this case. This Court finds no other errors of law and holds that the Bankruptcy Court's factual findings were not clearly erroneous.

a credit on, and "line off" entries with which it disagreed, explaining why it disagreed and "carrying forward" that item to the past due column on the next monthly statement. Some items remained in that column for months while the parties resolved them. The undisputed payments would be totaled and paid by check and through credits representing either credit vouchers or amounts deposited into PIM's account by Ocasco Budget Company, Ohio Casualty's premium financing arm.

The reconciliation and payments were due by the fifteenth of the month, at which time Ohio's Agency Accounts Department would review the reconciliation, either agreeing that PIM was correct that a particular item was not due or disagreeing with PIM and therefore placing a "please remit" code next to the disputed item in the past due column. Ohio Casualty had further review procedures in place when an item remained unpaid. Ohio Casualty became concerned about PIM's accounting practices because 25% or more of the amount due on PIM's statements was typically "past due," causing Ohio Casualty to worry that PIM was "floating money." The process continued in this fashion.

In 1992 and 1993, PIM paid approximately 96–98% of its premiums with Ocasco premiums or with cash received from other premium financing companies or the insureds themselves. Ohio Casualty allowed PIM to use credits to pay currently-due amounts even though the credit taken might be from a different insured's policy than the one for which PIM was paying Ohio Casualty and retaining its premiums; the Ocasco Budget manual provided that the credit voucher "may be used to pay any balance currently due to Ohio and does not have to be used to pay the premium of the policy financed." (Trial Ex. P–8, p. 3.)

There was a history of accounting problems with PIM dating back to 1989. Part of these problems included that PIM would take credits prematurely (i.e., before policy numbers were issued, before credit vouchers were returned, or before Ocasco deposited moneys into PIM's account). Other problems included that PIM would make payment one to five days late. Ohio Casualty would complain to PIM about its practices and temporarily suspend PIM as an agent or deny PIM the opportunity to use Ocasco Budget financing, only to reinstate PIM's privileges that same day or within a few days.

On November 15, 1993, Ohio Casualty, through its Branch Manager, David Himes, sent a letter to PIM that provided that Debtor would "no longer have the authority to write new business or bind coverage effective November 19, 1993," and that the agency relationship was terminated effective March 1, 1994. Four days later, Ohio Casualty issued the "official form letter" establishing the procedures for renewals. For example, for the first twelve months after March 1, 1994, PIM could request renewal of policies in writing; for personal automobile insurance policies only, the insured could choose to renew its policy after the twelve-month period through PIM, while renewals on all other policies after the twelve-month period would not go through PIM. The parties dispute the reason for the termination. According to Ohio Casualty, PIM had failed to account for premiums due the Company and for conversion of premiums. According to PIM, it was terminated because it was unwilling to violate the Fair Automobile Insurance Reform Act of 1990 ("FAIRA"), N.J.S.A. 17:33B–1 *et seq.*

In the months after the Notice of Termination was sent, monthly statements continued to be sent, reconciliations conducted, and payments made by PIM. Continued correspondence confirmed Ohio's intention to renew commercial policies through PIM for one year. The Notice of Termination itself, as well as forms Ohio Casualty submitted to the New Jersey Department of Insurance noticing PIM's termination, stated that the reasons for termination were "Poor loss ratio; continued accounting differences and contin-

ued pay off [sic] problems with premium finance companies and canceled accounts." PIM unsuccessfully sought injunctive relief, first in federal court and then in state court, after this termination.

Beginning in January 1994, after the Notice of Termination was sent, PIM began to take "improper credits" through selfhelp.[3] For example, at one point, PIM took a $9,095.52 credit against premiums due to Ohio Casualty because PIM claimed that a producer had a "restrictive covenant." (Debtor's Ex. 11 to Debtor's Motion to Expunge Ohio Casualty's Claim.) Another time, PIM improperly took a $52,-000 offset. (*Id.* at Ex. 10.) After January 1994, PIM applied credit for commissions owed on personal lines that Ohio Casualty began to withhold in October of 1993. As a result, as of the date of bankruptcy filing on August 4, 1994, PIM owed Ohio Casualty approximately $252,000. PIM's acts in withholding those sums were not fraudulent in the absence of knowing misrepresentations, but they were unjustified.

In May 1994, PIM entered into a contract to sell its book of business to another New Jersey producer, AJM, effective June 1, 1994. Ohio Casualty sought injunctive relief in the New Jersey superior Court to enforce the provisions of the agency agreement and to impose a prejudgment Writ of Attachment on the proceeds of the sale. On May 31, 1994, the Honorable John Mariano, J.S.C., preliminarily ordered that Ohio Casualty owned the book of business and required that any proceeds from the sale of the expirations be placed in escrow pending a final resolution. The order was upheld on reconsideration a month later, but no proceeds were ever placed in escrow because PIM's negotiations with AJM collapsed and the sale was never brought to fruition.

On August 5, 1994, PIM filed for Chapter 11. Ten days later, Ohio Casualty sent letters to PIM's insureds informing them that PIM was no longer Ohio Casualty's agent and that further renewals of their insurance policies would not come through PIM. On August 17, 1994, PIM filed its adversary complaint in the Bankruptcy Court seeking injunctive relief against Ohio Casualty. Temporary restraints were ordered two days later, but preliminary injunctive relief was denied; the Bankruptcy Court held that Ohio Casualty owned PIM's book of business. Ohio took over the book of business with AJM as its agent.

On March 7, 1996, the Bankruptcy Court held on the merits that Ohio Casualty did not own the book of business, but rather held an unperfected security interest in it, and the Bankruptcy Court ordered that the book of business be returned to the debtor. Six weeks later, the Bankruptcy Court ordered Ohio Casualty to pay PIM commissions on all commercial and personal insurance policies from April 1, 1996 going forward and to renew commercial policies in accordance with subsection (d) of N.J.S.A. 17:22–6.14a, and ordered Ohio Casualty to rescind the sixty-five notices of cancellation it had issued on personal automobile insurance policies. On appeal, the District Court affirmed in part and reversed in part, *In re Professional Ins. Mgmt.*, Civil No. 96–2499, Slip Op. and Order (D.N.J. July 8, 1996), and on November 25, 1997, the Third Circuit upheld the reversal by the District Court in two respects, *In re Professional Ins. Mgmt.*, 130 F.3d 1122 (3d Cir.1997), determining that Ohio Casualty did not violate New Jersey's "two-for-one rule" when it issued the sixty-five cancellations, and holding that the Bankruptcy Court could not order Ohio Casualty to pay commissions to PIM before the Bankruptcy Court determined whether the termination was under subsection (d) or (e) of N.J.S.A. 17:22–6.14a.

The Bankruptcy Court began plenary consideration of that issue, holding five

**3.** The parties in agreement that the Bankruptcy Court already found this when rendering decision on PIM's motion to expunge Ohio Casualty's claim. That credits were improperly taken during that time is not a fact subject to dispute at this point.

days of hearings in July of 1998. On July 16, 1998, however, by notice of discontinuance, Ohio Casualty, informed PIM that effective September 1, 1998, Ohio Casualty would stop accepting renewals and service requests from PIM and additionally would refuse to pay PIM any commissions.

PIM went to the Bankruptcy Court and filed an Order to Show Cause seeking a preliminary injunction and a six count Verified Complaint against Ohio Casualty, alleging that the Bankruptcy Court had jurisdiction to enjoin the Notice of Discontinuance pursuant to 28 U.S.C. § 1334(b). PIM contended that the Notice of Discontinuance violated the Automatic Stay and intentionally interfered with PIM's book of business, and asked for monetary damages in addition to preliminary and permanent injunctive relief. The Bankruptcy Court preliminarily enjoined Ohio Casualty from taking such action, and it scheduled a full plenary hearing for November 17, 1998 to determine whether Ohio Casualty should be permanently enjoined from discontinuing PIM as a terminated agent. The July hearings were continued for an additional two days in August and October of 1998, and the parties thereafter submitted written closing summaries.

At the time that the Bankruptcy Court held trial in this matter (for a total of seven trial days), there were several motions before the Court: PIM's motion for the turnover of postpetition commissions from the expirations renewing through Ohio Casualty, and Ohio Casualty's cross-motion for a determination that N.J.S.A. 17:22–6.14a(e) should govern and bar the entitlement to renewals and commissions. The Bankruptcy Court, in a July 12, 1999 Opinion and July 30, 1999 Order, denied Ohio Casualty's cross-motion, holding that the termination was not under N.J.S.A. 17:22–6.14a(e), but rather under N.J.S.A. 17:22–6.14a(d).

Ohio Casualty sought to appeal that Order. Applying the standards for determining whether to grant interlocutory appeal, this Court held that leave to appeal was not yet warranted, both because there was no substantial ground for difference of opinion on controlling questions of law and because granting leave would not materially advance the end of the litigation. *In re Professional Ins. Mgmt.*, Civil No. 99–3930, Slip Op. at 9, 18 (D.N.J. Sept. 22, 1999). In making those conclusions, this Court noted that the dispute between the two parties would not end with a resolution of the subsection (e) issue alone: if Ohio Casualty lost on appeal, then the Bankruptcy Court would still have to address Ohio Casualty's other arguments as to why PIM's motion for turnover of commissions should be denied, and, additionally, many other issues remained between the parties in the litigation (including whether Ohio Casualty's true reason for terminating PIM as an agent was because PIM refused to help Ohio Casualty violate FAIRA). *Id.* at 18–20.

Shortly before this Court issued its September 22, 1999 Order denying leave to appeal the July 30, 1999 Order, on September 15, 1999, the Bankruptcy Court entered a supplemental decision rejecting Ohio Casualty's claims for recoupment and constructive trust. The September 15, 1999 Opinion was effectuated by an October 14, 1999 Order which directed the turnover of commissions that accrued after April 1, 1996 on policies renewing pursuant to N.J.S.A. 39:6A–3 through Ohio Casualty. The October 14, 1999 Bankruptcy Court Order provided as follows:

- Ohio Casualty must turn over $216,-569.79 in direct bill commissions to PIM, from April 1, 1996 to July 26, 1999, plus any additional commissions through the date of the Order, without prejudice to PIM's right to seek interest on those commissions.
- Ohio Casualty must provide a detailed accounting of direct bill commission income since April 1, 1996.
- Ohio Casualty must continue to pay direct bill commissions that accrue to PIM as a terminated agent under N.J.S.A. 17:22–6.14a(d), along with an

accounting, on the 10th of every month after commissions are earned. (10/14/99 Bankruptcy Court Order pp. 1–3.) Additionally, the October 14, 1999 Order denied the application of a constructive trust on the commissions for Ohio Casualty's benefit, denied a recoupment, denied Ohio Casualty's application to stay payment of commissions generated after September 1, 1998 (based on the Notice of Discontinuance) or February 1, 1999 (based on Debtor's license revocation),[4] set up a mechanism by which PIM gives notice to Ohio Casualty before making distribution of the funds, and reserved decision on PIM's claim for commissions for the period from August 1994 through April 1996. (*Id.* at p. 3.)

After the October 14, 1999 Order was issued, Ohio Casualty sought clarification on certain issues, including whether the October 14, 1999 order was an interlocutory order or a final order, whether the turnover of funds could be stayed pending completion of the adversary proceeding, and whether Ohio could have an extension of time to file an appeal, and an October 20, 1999 telephone conference call was held to discuss the matter. In an October 22, 1999 Letter Opinion, the Bankruptcy Court specifically declined to characterize the nature of the October 14, 1999 Order, "except to note that the October 14, 1999 order was a final resolution of the debtor's motion for turnover of commissions from April 1, 1996, which motion was made in Adversary Proceeding No. 94–1312, and to recognize that additional issues remain to be heard in that proceeding...." (10/22/99 Letter Opinion at 3.) The Bankruptcy Court also denied Ohio Casualty's request for a stay of the October 14, 1999 Order pending resolution of remaining issues in the adversary proceeding because none of the issues remaining in the case "relate to debtor's entitlement to commissions since April 1, 1996." (*Id.*) Finally, the Bankruptcy Court denied the request for an extension of time for filing a notice of appeal. (*Id.* at 4.)

On October 25, 1999, Ohio Casualty filed a notice of appeal of the October 14, 1999 order and also sought a stay pending appeal. On October 29, 1999, PIM filed an application for an order to show cause why Ohio Casualty should not be held in contempt for violating the October 14, 1999 Order. The Bankruptcy Court addressed both motions at a November 15, 1999 hearing and in a November 17, 1999 Letter Opinion. The Bankruptcy Court rejected Ohio Casualty's argument that it had the automatic right to a stay pending appeal upon the posting of a supersedeas bond (pursuant to Fed.R.Civ.P. 62(d) and Fed. R. Bankr.P. 7062 and 9014) for two reasons. First, the Bankruptcy Court noted that certain types of judgments, "including an interlocutory or final judgment in an action for an injunction or in a receivership action, ..." are excepted from the automatic stay rule of 62(d), and commented that "the relief sought in this case by the debtor is more akin to injunctive relief than it is to a money judgment." (11/17/99 Letter Opinion at 6.) Second, the Bankruptcy Court found that the Court retained some discretion even where a bond is posted, and exercised that discretion to deny a stay. (*Id.*)

The Bankruptcy Court also found that Ohio Casualty was in contempt of the Court's October 14, 1999 Order that Ohio Casualty turn over $216,569.79 plus additional commissions within seven (7) days, since it had not sought a stay pending appeal in a timely fashion and had not yet paid. (*Id.* at 17.) The Bankruptcy Court ordered Ohio Casualty to turn over the commissions by Monday, November 22, 1999, with a daily sanction of $100 commencing the next day for every day after

---

4. Though it cannot affect this Court's review of the Bankruptcy Court orders, after the Bankruptcy Court reached its decision in this matter, the Appellate Division of the Superior Court of New Jersey has vacated the Commissioner's decision to revoke PIM's license and has stayed any resolution of that matter until after the Bankruptcy Court completes its proceedings. *Department of Banking & Insurance v. Professional Insurance Management Inc.,* Docket No. A–3400–98T2F, Slip Op. (N.J.Super.Ct., App.Div. Dec. 8, 1999).

November 22 until the commissions were paid, as well as interest from October 21, 1999 until the date of actual turnover of commissions and attorneys fees in connection with the Order to Show Cause. (*Id.* at 19.) The issue of whether Ohio must pay interest from April 1996 remained open. (*Id.*) Ohio Casualty timely filed objections to the Bankruptcy Court's findings of fact and conclusions of law with regard to the issue of contempt.

On January 5, 2000, the Bankruptcy Court issued an opinion and order stating that interest would indeed be due but leaving open the amount to be due. (01/05/00 Letter Opinion.) On January 19, 2000, the Bankruptcy Court entered an order directing Ohio Casualty to pay interest to PIM on the commissions due and owing as a result of the October 14, 1999 Order, from April 1, 1996 through the present date, according to the state postjudgment interest rate pursuant to New Jersey Court Rules, 2000, R. 4:42–11(a). In an Order dated February 17, 2000, the Bankruptcy Court set the amount of commissions at $228,933.29 and the total interest at $30,382.66. Ohio Casualty raises no challenge to the amount of interest but challenges the Bankruptcy Court's finding that interest be paid at all.

On November 19, 1999, Ohio Casualty asked this Court for an emergent stay pending appeal, and the Honorable Joseph E. Irenas entered a temporary stay until November 22, 1999, which was conditioned on Ohio Casualty paying $275,000 into Court. Based on reasons expressed in a November 22, 1999 Oral Opinion, I extended the temporary stay until the expedited date for oral argument upon the merits of the appeal. This Court held oral argument on January 21, 2000. The merits of the appeal are now before this Court.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

#### 1. Appellate Jurisdiction

28 U.S.C. § 158 governs appeals from bankruptcy courts to district Courts, and appeals to district courts are taken in the same manner as appeals from district courts to the courts of appeals. Fed. R. Bankr.P. 8001; 28 U.S.C. § 1291. Pursuant to 28 U.S.C. § 158(a), the District Court may hear appeals from "final judgments, orders, and decrees of the Bankruptcy Court; or with leave of court, from other interlocutory orders and decrees." 28 U.S.C. § 158(a)(1) and (3). Ohio Casualty contends that it has an appeal of the Bankruptcy Court's July 30, 1999 and October 14, 1999 Orders as a matter of right because those Orders are final orders for the purposes of this Court's review. PIM, on the other hand, argues that the Bankruptcy Court's orders were interlocutory and that this Court should not grant leave to appeal.

 Ordinarily, final orders are limited to those which dispose of all issues as to all parties to the case. *Metro Transportation Co. v. North Star Reinsurance Co.,* 912 F.2d 672, 677 (3d Cir.1990). In appeals from Bankruptcy Court orders, a literal application of this rule would preclude appeals from any order entered in a case or in adversary proceedings therein until an order closing or dismissing the bankruptcy case has been entered. *In re White Beauty View,* 841 F.2d 524, 526 (3d Cir.1988). As a matter of practicality, the concept of finality is seen somewhat more broadly in the bankruptcy context. *Id.*

 Additionally, in and out of the bankruptcy context, certain orders come within the concept of "practical finality." *See Forgay v. Conrad,* 47 U.S. 201, 6 How. 201, 12 L.Ed. 404 (1848). As the Third Circuit described it, the "practical finality" doctrine "only allows appellate review of judgments that are final except for ministerial or mechanical tasks and that conclusively determine the rights of the parties." *Securities and Exchange Comm. v. Black,* 163 F.3d 188, 195 (3d Cir.1998).

 PIM contends that neither the July 30, 1999 Order nor the October 14, 1999

Order is a final order. In support of this argument, PIM makes several points. First, PIM notes that Ohio Casualty conceded that the July 30, 1999 Order was interlocutory when it moved for leave to appeal from that as an interlocutory order. Second, PIM contends that the October 14, 1999 Order was not final because, as the Bankruptcy Court highlighted, additional issues remain to be heard in the adversary proceeding.

In this case, there are, to be sure, other substantial issues remaining to be determined, issues that are not ministerial or mechanical, but rather which constitute resolutions of major substantive disputes between the parties. However, the remaining issues would have no impact on the turnover of commissions to the Debtor that have accrued after April 1, 1996 or on PIM's entitlement to commissions under the Terminated Agent's statute. The issues decided collectively in the July 30, 1999 and October 14, 1999 Orders are discrete issues, and no effect or impact of those decisions would change as a result of the Bankruptcy Court's future ultimate decision as to whether PIM is entitled to damages for wrongful termination. As the Bankruptcy Court said, the relief which the Bankruptcy Court granted, which is more akin to injunctive relief than to a money judgment, constitutes a "final resolution of the debtor's motion for turnover of commissions from April 1, 1996."

The Fifth Circuit has explicitly held that a turnover order is a final order: "Following the lead of every circuit court that has considered the question directly or indirectly, we hold that a bankruptcy court's turnover order, in a separate adversary proceeding, compelling a defendant to turn over property in his possession to the trustee in bankruptcy, is a final order and hence appealable as of right." *In re Moody*, 817 F.2d 365, 366 (5th Cir.1987). *See also In re Walsh Trucking Co., Inc.*, 838 F.2d 698 (3d Cir.1988) (bankruptcy court's order granting debtor expungement of credit's claim was a final order).

In the *Moody* case, the granting of the turnover was the end of the adversary proceeding, but the Fifth Circuit's reasoning is nonetheless applicable: "[t]he issue between the parties to this adversary proceeding was definitively resolved when the court issued the turnover order." *Moody*, 817 F.2d at 368. Here, other issues remain between the parties in this adversary proceeding, but this issue (propriety of turnover of commissions post-April 1996) was definitively resolved. Certainly, the turnover order has a final impact on the parties: Ohio Casualty must turn over large sums of money now, which will be used by the trustee to divide among creditors; Ohio Casualty may never see that money again. *Compare Walsh Trucking*, 838 F.2d at 701 ("The impact that the expungement order will have on the distribution of the debtor's assets is self-evident. This consideration weighs heavily in favor of treating the decision of the bankruptcy court as a final order.").

Additionally, this Court would have jurisdiction, without the need to resort to discretion to grant leave to appeal, even if these two orders, together, were not final. The orders entered by the Bankruptcy Court are in the form of injunctive relief rather than a money judgment; while Ohio Casualty must pay PIM over $200,000 in money owed and accruing since April 1996, it is part of a larger, continuing order to pay commissions. The injunctive character of these orders is also evident from the duty imposed upon Ohio Casualty with respect to the ongoing accrual of PIM's commissions, namely, to pay them over as they are earned, now and in the future. An injunction, whether permanent or preliminary, is appealable. *See* 28 U.S.C. § 1292(a)(1) (courts of appeals have jurisdiction of appeals from interlocutory orders granting injunctions); 28 U.S.C. § 158(c)(2) (appeals of bankruptcy court orders taken to district court in same manner as district court orders are appealed to courts of appeal).

Therefore, this Court has jurisdiction to hear this appeal.

## 2. Standard of Review on Appeal

■ The standards which the courts of appeals would apply in reviewing district court decisions apply equally to district court review of Bankruptcy Court decisions. A plenary standard applies when reviewing the Bankruptcy Court's legal findings (including the legal bases for equitable remedies), *In re Livingston & Co., Inc.*, 186 B.R. 841, 848 (D.N.J.1995), and application of legal standards to the facts. *See DiFederico v. Rohm Co.*, 201 F.3d 200, 205–06 (3d Cir.2000) (citing *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 838 (3d Cir.1994)).

■ While this Court, then, reviews legal determinations *de novo*, factual determinations are held to a "clearly erroneous" standard. *See In re B.S. Livingston*, 186 B.R. at 848. *See also DiFederico*, Slip Op. at 10 (citing the standard of appellate review stated in *Gavalik v. Continental Can Co.*, 812 F.2d 834, 850 (3d Cir.1987)). Under this standard, " '[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the factfinder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.' " *DiFederico*, 201 F.3d at 208 (citing *Coalition to Save Our Children v. Board of Educ.*, 90 F.3d 752, 759 (3d Cir.1996) (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972))). In reviewing these factual findings, this Court will not secondguess credibility determinations. *DiFederico*, 201 F.3d at 208.

■ Finally, the district court's review of the Bankruptcy Court's decisions with regard to equitable remedies for which there is a legal basis is reviewed only for abuse of discretion. *See Voest–Alpine Trading USA Corporation v. Vantage Steel Corporation*, 919 F.2d 206, 211 (3d Cir.1990).[5]

## 3. Primary Jurisdiction

■ Ohio Casualty contends that the Bankruptcy Court erred by not deferring to the expertise of the Commissioner of Banking and Insurance under the doctrine of primary jurisdiction for an interpretation of subsection (e) before applying it to the facts of the case. Ohio Casualty also raised this issue when seeking leave to appeal the Bankruptcy Court's July 30, 1999 Order, and this Court addressed the issue in the September 22, 1999 Opinion. The Court's reasoning at that time is fully applicable now, and it will be only briefly summarized here.[6] Primary jurisdiction is

**5.** As explained in the *Voest–Alpine* case, the court sitting in its appellate jurisdiction determines the legal bases for imposition of equitable remedies such as a constructive trust *de novo* and reviews the factual findings to which the legal bases are applied for clear error, but the actual choice to exercise equitable powers is reviewed only for abuse of discretion. Thus, if a trial court imposes a constructive trust based upon clearly erroneous facts, or if, assuming that the facts as found are correct, those facts still do not provide a legal basis for a constructive trust, then the imposition of that equitable remedy would be found to be an abuse of discretion.

**6.** The parties dispute whether Ohio Casualty raised this issue before the Bankruptcy Court, which it must have done in order to raise the issue on appeal to this Court. As this Court explained in the September 22, 1999 Opinion, there is substantial doubt that Ohio Casualty did raise the issue, since the sum total of Ohio Casualty's challenge to the Bankruptcy Court's exercise of jurisdiction consisted of three lines of a preliminary statement in its brief to the Bankruptcy Court, compared with the numerous pages of documents filed in the Court and the countless hours of courtroom time devoted to this case. Ohio Casualty later did raise the issue to the Bankruptcy Court, in the course of arguments concerning recoupment and constructive trust, which were addressed in the Bankruptcy Court's September 15, 1999 Opinion. Because the Bankruptcy Court did have the opportunity to address the jurisdictional issue before issuing its October 14, 1999 Order, this Court considers the issue to have been appropriately raised in the lower court.

not a doctrine which limits the court's jurisdiction, but rather one which advises deference of resolution of a claim until an administrative body with special competence for issues within that claim has resolved those issues. *See Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1230 (3d Cir.1994). That "special competence" is manifested in the existence of an elaborate regulatory scheme, the need to preserve and promote relationships between courts and agencies, the presence of an issue within a claim that is within the agency's special expertise, and the need to preserve uniformity in the interpretation of regulations. *See Campione v. Adamar of New Jersey, Inc.*, 155 N.J. 245, 248–49, 714 A.2d 299 (1998).

This Court has recognized that an earlier dispute between these parties did involve an issue which was within the "special competence" of the Commissioner of Banking and Insurance: whether Ohio Casualty violated the "take all comers" provisions of the Fair Automobile Insurance Reform Act ("FAIRA"). FAIRA is a pervasive regulatory scheme over the automobile insurance industry, the parties were already before the Commissioner on related matters, interpretation of the "take all comers" provisions of FAIRA and whether defendants/appellants withdrew from the market were within the Commissioner's expertise, and there was an actual risk of inconsistent rulings because of a case already before the Commissioner. (3/2/99 Slip Op. at 21–22.)

By contrast, the instant dispute between the parties does not involve an interpretation of a section of FAIRA. Moreover, the Commissioner's "special expertise" is not necessary to interpret subsection (e); the plain language of that section is clear and unambiguous, and judges, including bankruptcy judges, are certainly qualified to engage in statutory construction.[7] Additionally, any risk of inconsistent rulings here is selfimposed by Ohio Casualty, for Ohio Casualty filed a counterclaim for declaratory relief seeking the Commissioner's determination of subsection (e) *after* the Bankruptcy Court issued its July 12, 1999 Opinion.[8]

In addition to the application of the *Campione* factors, this Court also finds that it would be too costly in terms of time to defer to the Commissioner in this instance. As of September 17, 1999, the Commissioner still had given no indication that an administrative hearing was scheduled on the FAIRA issue this Court referred to the Commissioner on March 2, 1999. To defer yet again to the Commissioner, who the Appellate Division has specifically characterized as having "rush[ed] to judgment" in related matters, see *Department of Banking & Insurance v. Professional Insurance Management Inc.*, Docket No. A–3400–98T2F, Slip Op. at 2

---

**7.** Ohio Casualty argues that "[t]his is not merely a simple case of statutory construction by a Court of competent jurisdiction. There is no case law interpreting the Statute; no legislative history; no regulations, no authority that was available to guide the Bankruptcy Court." (Ohio's Reply B. at 15.) To the contrary, this case involves the simplest form of statutory construction: unambiguous and clear language. There is no need to turn to legislative history, regulations, and other authorities for guidance.

**8.** Ohio Casualty contends that "[t]he risk of inconsistency does not so much arise from Ohio's request for declaratory relief, but from the inconsistency of the Bankruptcy Court's ruling with the statutory and regulatory scheme governing agents and insurance com-

panies." (Ohio's Br. at 34.) Ohio Casualty's contention is really that the Bankruptcy Court (and, by extension, this Court) erred by interpreting subsection (e) incorrectly in a way that conflicts with other insurance laws. That is what the appeals process is for. If subsection (e) were at all ambiguous, a court, or the Commissioner, could look to policies at play in the myriad of insurance laws altogether in an effort to pin down the legislature's meaning for the ambiguous terms. Given that subsection (e) is unambiguous, courts (and the Commissioner) may not rewrite the unambiguous language, even if it is inconsistent with other insurance laws or the legislative purpose of the statute. That task is for the legislature to complete, should it choose to do so.

(N.J.Super.Ct., App.Div. Dec. 8, 1999), could leave an important issue in limbo and severely hinder the Bankruptcy Court's administration of PIM's estate. This Court is unwilling to do just that.

The Bankruptcy Court did not err in not deferring to the primary jurisdiction of the Commissioner of Banking and Insurance.

### B. *Whether PIM Was Terminated At Will or For Cause*

The Agency Agreement between PIM and Ohio Casualty does not provide for renewal commissions to be paid to PIM on renewed policies after Ohio Casualty's terminates the agency relationship. New Jersey law, however, does make provision for this. More specifically, N.J.S.A. 17:22–6.14a(d) ("subsection (d)") provides:

> Termination of any such contract for any reason other than one excluded herein shall become effective after not less than 90 days' notice in writing given by the company to the agent and the Commissioner of Banking and Insurance. No new business or change in liability on renewal or in force business, except as provided in subsection 1. of this section, shall be written by the agent for the company after notice of termination without prior written approval of the company. However, during the term of the agency contract, including the said 90–day period, the company shall not refuse to renew such business from the agent as would be in accordance with said company's current underwriting standards. The company shall, during a period of 12 months from the effective date of such termination, provided the former agent has not been replaced as the broker of record by the insured, and upon request of the terminated agent, renew all contracts of insurance for such agent for said company as may be in accordance with said company's then current underwriting standards and pay

to the terminated agent a commission in accordance with the agency contract in effect at the time the notice of termination was issued. Said commission can be paid only to the holder of a valid New Jersey insurance producer's license. . . .

N.J.S.A. 17:22–6.14a(d). Thus, under subsection (d), an insurance company would be liable for paying the agent renewal commissions if the insurer terminates the agent at will.

N.J.S.A. 17:22–6.14a(e) ("subsection (e)") establishes exceptions to this general rule:

> The agency termination provisions of this act shall not apply to those contracts:
>
> (1) in which the agent is paid on a salary basis without commission or where he agrees to represent exclusively one company or to the termination of an agent's contract for insolvency, abandonment, gross and willful misconduct, or failure to pay over to the company moneys due to the company after his receipt of a written demand therefor, or after revocation of the agent's license by the Commissioner of Banking and Insurance; and in any such case the company shall, upon request of the insured, provided he meets the then current underwriting standards of the company, renew any contract of insurance formerly processed by the terminated agent, through an active agent, or directly pursuant to such rules and regulations as may be promulgated by the Commissioner of Banking and Insurance. . . .

N.J.S.A. 17:22–6.14a(e).

In the instant case, the Bankruptcy Court determined that Ohio Casualty terminated PIM pursuant to subsection (d), rather than pursuant to subsection (e), thus entitling PIM to renewal commissions. In doing so, the Bankruptcy Court found that subsection (e) lists "for cause" reasons for termination,[9] and it made fac-

---

9. Subsection (e) is about much more than "for cause" reasons for termination. However, no one contends that PIM was paid on a salary basis or that the agency was terminated after the Commissioner revoked PIM's license. Thus, those aspects of subsection (e)

tual findings that those "for cause" reasons were not met in this case. Ohio Casualty challenges both the Bankruptcy Court's interpretation of subsection (e) as well as its factual findings.

■ Ohio Casualty contends that subsection (e) applies either if an agent was terminated for willful misconduct *or* if an agent failed to remit premiums due the company, regardless of whether or not the failure to remit premiums due was the reason for termination. In addition to citing the language of subsection (e) as support for this contention, Ohio Casualty points to various sources for the notion that an agent's rights to receive commissions be abdicated upon the agent's failure to remit premiums, even if that failure is not the reason for termination. *See Department of Insurance v. Universal Brokerage Corporation,* 303 N.J.Super. 405, 697 A.2d 142 (App.Div.1997) (Appellate Division agreed with Commissioner that an agent whose license the Commissioner revoked had to repay commissions it had earned to the insurer because a fiduciary who fraudulently converts premiums has no right to commissions). *See also In re Murphy,* 9 B.R. 167 (Bankr.E.D.Va.1981) (agent breached its fiduciary relationship with insurer by withholding premium funds and using them for his own purposes and thus was not entitled to receive renewal commissions); 4 *Couch on Insurance* § 57:50 (3d Ed.) ("If insurer terminates the agency because of the agent's misconduct, the latter will, in most cases, forfeit his or her right to renewal commissions, as when the relationship is terminated because the agent wrongly fails to remit premiums to the insurer . . ."); *Insurance Agent's Right to Commissions on Renewal Premiums,* 36 A.L.R.3d 958, 1971 WL 28460 (1971) (in the absence of a provision in the contract for payment of commissions on renewals after termination, it has been held that the agent is not entitled to renewal commissions in certain circum-stances, such as withholding premium funds).

Contrary to Ohio Casualty's contention, the Bankruptcy Court correctly determined that the termination must be a result of an agent's wrongful acts in order for subsection (e) to apply. With the exception of *Universal Brokerage,* none of the sources to which Ohio Casualty points interpret New Jersey law. Even if other states' laws are similar to New Jersey's statute, interpretations of other states' laws are not authoritative in New Jersey statutory interpretation. More tellingly, each of those sources discuss forfeiture of renewal commissions when failure to remit is the cause of termination; none of them support an interpretation of subsection (e) which would deny commissions after the termination if the termination was not based upon the failure to remit premiums.

As this Court stated in its September 22, 1999 Opinion denying leave to appeal, the *Universal Brokerage* case certainly stands for the policy that a "terminated agent cannot profit from failure to remit premiums after demand therefor even when it occurs after the termination date." (9/22/99 Slip Op. at 12.) This policy statement may well have an effect on the Bankruptcy Court's equitable determinations. However, *Universal Brokerage* did not interpret subsection (e). The plain and unambiguous language of subsection (e) reads, in pertinent part, that "[t]he agency termination provisions of this act shall not apply . . . to the termination of an agent's contract for insolvency, abandonment, gross and willful misconduct, or failure to pay over to the company moneys owed due to the company after his receipt of a written demand therefor. . . ." N.J.S.A. 17:22–6.14a(e). The language clearly establishes that subsection (e) applies if the termination is a result of gross and willful misconduct *or* failure to pay over funds; the causal relationship is a necessary predicate to subsection (e)'s applicability. In

---

are irrelevant, and only that language regarding gross and willful misconduct and failure to pay over monies due need be considered in the instant case.

other words, if the termination was caused by the agent's gross and willful misconduct or failure to pay over funds after receipt of a written demand, then subsection (e) applies and the terminated agent when earn no post-termination commissions.

Nothing in *Universal Brokerage*'s policy statement can alter the effect of the plain language of the statute. *Friedrich v. United States Computer Services*, 974 F.2d 409, 419 (3d Cir.1992). This Court and the Bankruptcy Court cannot rewrite unambiguous law to fit a court's conception of equity. The straight application of subsection (e), without resort to equity, might result a terminated agent's right to receive commissions even where it has failed to remit premiums after the date of termination. However, "this Court is not free to rewrite the statute to preclude that result where the unambiguous language of subsection (e) does not." (9/22/99 Slip Op. at 13.) The Bankruptcy Court did not err in its interpretation of N.J.S.A. 17:22–6.14a(e) in that regard.

■ The Bankruptcy Court did, however, rely upon incorrect assumptions about subsection (e) when determining what evidence would be considered in applying the facts to subsection (e). The Bankruptcy Court found that because the Notice of Termination which was sent on November 15, 1993 stated that the termination was at-will, and because the person at Ohio Casualty who made the decision to terminate PIM as an agent (David Himes) had never even heard of a subsection (e) termination, the termination, as of November 15, 1993, was a subsection (d) termination. As of the date of oral argument before this Court, PIM no longer contested that finding.[10] The Bankruptcy Court determined that because the Notice of Termination was sent on November 15, 1993, evidence from after that date was irrelevant and immaterial to a determination of what Ohio Casualty's intent was in terminating PIM as an agent, for by the time the Notice of Termination was sent, the reasons for termination had already been fully formed.

The Bankruptcy Court's decision to ignore evidence from after November 15, 1993 was based on an incorrect assumption that an agent could not be terminated under both subsection (d) and subsection (e). Subsection (d) terminations require notice. By statute, subsection (d) provides that the termination itself is not effective for at least ninety days after the notice of termination is sent, even though the agent cannot write new business during that time period within prior approval by the insurance company.[11] Nothing in subsection (e), on the other hand, indicates that a formal Notice of Termination must be sent; an insurance company can terminate an agent immediately upon discovering the

10. Ohio Casualty argued to the Bankruptcy Court that PIM committed "gross and willful misconduct" and "failed to remit moneys due after demand" for those monies both before and after the Notice of Termination was sent. The Bankruptcy Court found that PIM did not commit "gross and willful misconduct" and was substantially current in payments prior to November 15, 1993. Though Ohio Casualty does not agree with that finding, it no longer challenges (as of oral argument) the Bankruptcy Court's finding that as of November 15, 1993, when the Notice of Termination was sent, the reason for termination was not gross and willful misconduct or failure to pay moneys due. Ohio Casualty simply contends that the termination became a subsection (e) termination at some point after the November 15, 1993 Notice of Termination was sent.

11. The Bankruptcy Court made much of the fact that PIM was practically terminated as of November 15, 1993 because PIM could not write any new business. By the very terms of subsection (d) however, though the agent is practically "terminated" as of the date upon which the Notice is sent because it cannot write new business, the termination itself does not become effective in less than ninety days (and Ohio Casualty gave slightly more than ninety days notice by listing March 1, 1994 as the effective date). In many instances, there are practical differences beyond the statutory ones as well: even though agents cannot write new business in the ninety day period, they may attempt to move the entire book of business to another insurance company during that time.

agent's gross or willful misconduct or failure to pay over moneys due after receipt of a written demand therefor, without being subject to the agency termination provisions of subsection (d). Because no separate Notice is needed for a subsection (e) termination, and because the subsection (d) termination cannot, by law, be effective for ninety days after the Notice is sent, it is possible that a subsection (d) termination can transform into a subsection (e) termination before the effective date of the subsection (d) termination passes.

Thus, while the Bankruptcy Court was not clearly erroneous in determining that as of November 15, 1993, Ohio Casualty had only decided to terminate PIM under subsection (d), the Bankruptcy Court erred by excluding evidence of whether Ohio Casualty also terminated PIM based on reasons listed in subsection (e) after November 15, 1993 and before March 1, 1994 (the date of termination stated in the November 15, 1993 letter). However, in this case, that error was harmless.

■■■ At oral argument, this Court asked the parties whether there is any evidence that between November 15, 1993 and March 1, 1994, Ohio Casualty terminated PIM for reasons listed in subsection (e). Ohio Casualty responded that there was evidence that in May of 1994 it asked a court for PIM's book of business and that Ohio Casualty wrote to insurers in August of 1994 informing them that their policies would be renewed but not through PIM. This evidence does not show that PIM was terminated under subsection (e); these actions took place after March 1, 1994, and though PIM could be officially terminated under subsection (e) after Ohio Casualty had already sent a subsection (d) Notice of Termination, PIM could not be "re-terminated" once the subsection (d) termination was effective. Only evidence of acts of termination between November 15, 1993 and March 1, 1994 are relevant. While the evidence need not be as formal as a letter of termination to the agent, an insurance company cannot just decide that

an agent's termination is now under subsection (e) without telling anybody; there must be some evidence that the insurance company told someone—perhaps the insureds themselves—that renewals would no longer come through the terminated agent.

In response to this Court's inquiry into whether any such evidence from between November 15, 1993 and March 1, 1994 existed, Ohio Casualty was unable to point to anything. In fact, Ohio Casualty's conduct in continuing to pay renewal commissions throughout that time period, which is consistent with a subsection (d) termination, undermines any contention that they terminated PIM under subsection (e).

Therefore, while the Bankruptcy Court erred in deciding not to considering any evidence after the Notice of Termination was sent, that error was harmless in this case because the record contains no material evidence from the relevant dates which would suggest that the subsection (d) termination transformed into a subsection (e) termination. The Bankruptcy Court's finding that PIM was terminated only under subsection (d) will not be overturned. As a consequence, PIM was entitled by subsection (d) to continue to receive the renewal commissions at issue herein, accruing after April 1, 1996, as the Bankruptcy Court correctly decided.

### C. Recoupment

If an equitable remedy such as recoupment or constructive trust were not imposed, Ohio Casualty would have to wait in the line of other unsecured creditors in order to recoup the money which PIM owes it. If the Bankruptcy Court were to have imposed the remedy of recoupment, Ohio Casualty would be able to set off its debt to PIM with the debt PIM owes to it.

Ohio Casualty asked the Bankruptcy Court to impose the remedy of recoupment, such that if PIM was owed renewal commissions from April 1996 on because the termination was under N.J.S.A. 17:22–

6.14a(d), then Ohio Casualty was entitled to keep those funds because PIM's debt to Ohio Casualty is larger than the amounts which Ohio Casualty would owe to PIM in renewal commissions. The Bankruptcy Court rejected that argument, finding that "the commissions that would be paid by Ohio to the debtor from April 1, 1996" were not "a 'single integrated transaction' with the post-petition debt due to Ohio from the debtor as of August 4, 1994." *In re Professional Insurance Management*, No. 94–1312, Slip Op. at 23 (Bankr. D.N.J.Sept. 15, 1999). Ohio Casualty contends that the Bankruptcy Court erred in making that factual determination. The issue to be decided upon this appeal is whether the Bankruptcy Court abused its discretion in declining to impose the equitable remedy of recoupment as requested by Ohio Casualty.

 The doctrine of recoupment is an equitable doctrine which serves to avoid inequities inherent in allowing a debtor to accept the benefit of a contract without also accepting the burdens. *In re Flagstaff Realty*, 60 F.3d 1031, 1035 (3d Cir. 1995). It is similar to the statutory remedy of set-off, set out in 11 U.S.C. § 506(a), in which an unsecured claim is effectively elevated to secured status "to the extent that the debtor has a mutual, pre-petition claim against the creditor," see *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984), but it differs in two important ways. First, the creditor's post-petition debts to the debtor cannot be setoff against the debtor's pre-petition debts to the creditor, see 11 U.S.C. § 553, while the equitable doctrine of recoupment can be used to extinguish post-petition debts to the debtor based on pre-petition debts to the creditor. *Lee*, 739 F.2d at 875. Second, the mutual debt and claim involved in setoff may be from different transactions, see *In re University Medical Center*, 973 F.2d 1065, 1079 (3d Cir.1992), while recoupment is limited to claims and demands from the same transaction. *Id.* In order for recoupment to apply, "*both debts must arise out of a single integrated transaction....*" *Id.* at 1081 (emphasis added). The most common situation in which this applies is in the advance payment context, such that the creditor provides an advance payment "based on estimates of what would ultimately be owed, subject to later correction," although it is not necessarily so limited. *Id.* at 1080. However, the fact that there is a contract between the debtor and creditor does not necessarily give rise to recoupment. *Id.* Nor does "[t]he fact that the same two parties are involved, and that a similar subject matter gave rise to both claims...." *Lee*, 739 F.2d at 875.

The distinction makes sense. Setoff reflects a legislative decision that pre-petition creditors are entitled to set off prepetition debts owed to the debtor, such that the claims are mutual and cancel each other out, essentially transforming an unsecured creditor into a secured one. Outside of the legislative mandate reflected in the statute, the general rule is that unsecured creditors must wait in line like all other unsecured creditors, and the courts have created an exception to that rule where demands and claims, whether pre-petition or postpetition, come from the same transaction. Were the exception broader, it would do great damage to the role of the bankruptcy court in discharging the debt. Congress may create broader exceptions to the general rule; the courts may not. See *University Medical Center*, 973 F.2d at 1081 (this is "in accord with the principle that this doctrine, as a nonstatutory, equitable exception to the automatic stay, should be narrowly construed").

Largely, Ohio Casualty argues that the Bankruptcy Court erred as a factual matter. Also, to a limited extent, Ohio Casualty contends that the Bankruptcy Court erred legally by applying the wrong definition of what is necessary for a recoupment. The Bankruptcy Court, however, correctly applied the tests set forth in *Lee, University Medical Center,* and *Flagstaff Realty Associates,* the governing law in the Third

Circuit. Ohio Casualty's support for a different test comes from *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390 (D.C.Cir.1997), in which the D.C. Circuit disagreed with the Third Circuit's concept of "single transaction." This Court and the Bankruptcy Court, however, are bound by the Third Circuit's formulation of the law, regardless of the views taken by other courts. The Bankruptcy Court correctly stated the relevant law.

 Ohio Casualty's main argument regarding recoupment is that the Bankruptcy Court erred in finding that the post-April 1996 commissions and the pre-August 1994 debt were not a part of the same, single, integrated transaction. That factual finding is reviewed for clear error, see *In re B.S. Livingston*, 186 B.R. at 848, and it will only be overturned if it completely lacks "minimum evidentiary support displaying some hue of credibility" or if it is not at all rationally related to the evidence. *DiFederico*, 201 F.3d at 207.

 In this case, it is acknowledged that the record contains evidence from which the Bankruptcy Court could have found that the pre- and post-petition debts were from the same exact transaction, because the parties often mixed personal and commercial policies together as a part of their reconciliation process. There is also ample evidence to the contrary in the record that the pre-petition debt arose from commercial insurance policies while the post-petition debt arose from personal automobile insurance policies, such that these transactions were not single or integrated, but instead were a course of business dealings involving differing services and aspects of the Ohio/PIM relationship.

This situation is fairly analogous to the factual background of *University Medical Center*, 973 F.2d 1065. In that case, a medical center serviced Medicare beneficiaries through a "provider agreement" with the Department of Health and Human Services ("HHS"). *Id.* Pursuant to the rules of the agreement, a fiscal intermediary (such as the Blue Cross Association) would make periodic interim payments, which were estimates of actual expenditures, to the provider upon application of the provider at the discharge of each Medicare patient, and later HHS would adjust the provider's subsequent Medicare reimbursement payments to account for prior over- or underpayments based on actual expenditures, which are audited annually. *Id.* at 1070. The Third Circuit found that this ongoing relationship and system of reconciliation was not sufficient to support a conclusion that overpayments made in 1985 arose from the same transaction as Medicare payments due to the provider in 1988. *Id.* at 1081. The Third Circuit found that the annual reconciliation process set out in the provider agreement did not turn 1985 and 1988 payments into one transaction, but rather established on ongoing relationship in which "independently determinable" payments were due for "completely distinct" services were balanced against one another. *Id.* at 1081–82.

The Third Circuit's reasoning in *University Medical Center* is fully applicable here to support the Bankruptcy Court's finding that the reconciliation process in which the parties engaged simply established an ongoing relationship between them. The Bankruptcy Court was entitled to rely upon the fact that the pre-petition debt to Ohio Casualty arose from commercial policies and the post-petition debt to PIM arose from personal automobile policies in determining that these debts arose from separate, though related transactions, and that the standards for recoupment set out in *University Medical Center, Lee*, and *Flagstaff Realty Associates* were not met. Because there is clearly sufficient evidence in the record on which the Bankruptcy Court could rely in deciding that this was not a single integrated transaction, this Court cannot find that finding clearly erroneous, and the decision to deny equitable recoupment will not be disturbed.

### D. Constructive Trust

■ Ohio Casualty asked the Bankruptcy Court to impose a constructive trust over renewal commissions due and owing since April of 1996, arguing that PIM would be unjustly enriched if it was entitled to receive hundreds of thousands of dollars in renewal commissions when it failed to pay Ohio Casualty hundreds of thousands of dollars in premiums due prior to August of 1994. The Bankruptcy Court declined to impose a constructive trust over those commissions, and this Court reviews that determination for abuse of discretion.

■ The Bankruptcy Court held that PIM did not commit fraud or misappropriation prior to the date of the Notice of Termination (November 15, 1993). *In re Professional Insurance Management, Inc.*, Docket NO. 94–1312, Slip Op. at 15 (D.N.J.Bankr.Sept. 15, 1999). The Bankruptcy Court further held that PIM's unjustified acts, after the Notice of Termination was sent, of taking credit on its monthly premium statement for a reduction in commissions which Ohio had imposed in 1993 violated PIM's fiduciary duty to Ohio Casualty. *Id.* at 17. Nonetheless, the Bankruptcy Court exercised its discretion to not impose a constructive trust on the renewal commissions. "New Jersey law permits imposition of constructive trusts to account for some wrongful act, such as fraud, mistake, or undue influence, which has resulted in a transfer of property ..., *see generally Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 94 (2d Cir.1989) ..., or when failure to do so would result in unjust enrichment. *See Stewart v. Harris Structural Steel Co.*, 198 N.J.Super. 255, 486 A.2d 1265, 1271 (1984)." *In re Greate Bay Hotel and Casino, Inc.*, No. 99–5298, Slip Op. at 9, 2000 WL 159039 (3d Cir. Jan. 31, 2000). Applying New Jersey law on constructive trusts, the Bankruptcy Court held that

> the concept of constructive trust envisions the imposition of a trust to recover particular property which was acquired or transferred by fraud, mistake, or unjust enrichment. The concept is not intended to apply to a situation like the one presented here, where the property in question (commissions earned by the debtor post-petition and post-turnover) is in the hands of the entity asserting entitlement to a constructive trust on those post-petition proceeds on the basis of a pre-petition debt due to it. In the bankruptcy context, the practical effect of imposing a constructive trust on the debtor's post petition property is to favor one creditor over the other creditors who hold claims against the estate, with no basis for such priority.

*Id.* at 21.

■ In this aspect of the appeal, Ohio Casualty does not challenge the Bankruptcy Court's general statement of the law of constructive trusts, and that statement was correct. Neither side has challenged the Bankruptcy Court's factual finding that PIM's wrongful conduct in retaining premiums in order to setoff reduced commissions from 1993 was a violation of PIM's fiduciary duty to Ohio Casualty.[12] Ohio Casualty does challenge the Bankruptcy Court's factual finding that Ohio Casualty's postpetition debt to PIM did not arise from the same transaction as PIM's pre-petition debt to Ohio Casualty, but, as this Court has already explained, that finding was not clearly erroneous. Ohio Casualty's real concern is that the Bankruptcy Court chose not to impose a

12. Ohio Casualty does challenge the Bankruptcy Court's factual finding that PIM did not engage in gross and willful misconduct prior to the date on which Ohio Casualty sent the Notice of Termination. This Court has already addressed that finding *supra* in Part II.B. In any case, that factual finding had no impact on the Bankruptcy Court's decision to not impose a constructive trust, for that decision was based purely on the Bankruptcy Court's view that it would not grant a constructive trust over property unless it was that particular property that was misappropriated.

constructive trust on the post-April 1996 commissions because those commissions were not the exact property that PIM misappropriated.[13]

In support of its view, Ohio Casualty relies on the decision in *Universal Brokerage*, 303 N.J.Super. 405, 697 A.2d 142, for the concept that PIM lost its right to collect these renewal commissions when it failed to remit premiums to Ohio Casualty.[14] Though Ohio Casualty contends that the Bankruptcy Court took a very narrow view of the purpose of a constructive trust, aside from this general statement of policy, Ohio Casualty cites to no law which would contradict the Bankruptcy Court's statement that, as a general matter, constructive trusts should only be placed on the very property which was misappropriated. This Court has no basis upon which to say that the Bankruptcy Court's conclusion in that regard is incorrect or that it constitutes an abuse of discretion. Therefore, this Court will affirm the Bankruptcy Court's decision not to impose a constructive trust over the renewal commissions due to PIM.

## E. *Interest*

Though Ohio Casualty does not contest the quantum of interest which the Bankruptcy Court has ordered it to pay PIM, it does contest the fact of the order to pay interest. New Jersey law provides for pre-judgment interest in tort actions, Rule 4:42–11(b), and pre-judgment interest may run on contract claims in accordance with equitable principles. *Id.* at comment 9. *See also W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 219 (3d Cir. 1984). Ohio Casualty points out that the rule provides for pre-judgment interest only on money judgments, not interlocu-

tory orders, and contends that the Bankruptcy Court here made only an interlocutory order, not a final money judgment. Ohio Casualty also argues that if interest is to be paid, it should be suspended from October 16, 1998 through October 14, 1999 because of judicial delay in deciding whether the termination was pursuant to subsection (d) or subsection (e), and from May 2, 1996 through July 8, 1996 because this Court had issued a judicial stay pending appeal.

The Court notes, first, that Ohio Casualty's argument in this regard contradicts its earlier argument that the Bankruptcy Court's orders are final orders for the purposes of this Court's appellate jurisdiction. More importantly, however, the Bankruptcy Court did not abuse its discretion or err as a matter of law in ordering interest to be paid. Here, the Bankruptcy Court's order to turnover commissions is an amalgam of a final money judgment and an injunction. In part, Ohio Casualty is ordered to pay commissions from this point forward. In that respect, the order is injunctive and the duty is continuing, but the award of interest does not apply to future moneys due. The interest award applies only to Ohio Casualty's duty to pay past due commissions, because the injunctive aspect of the order requires that future commissions of this type be paid promptly as they accrue. With respect to pas due commissions wrongfully withheld, the order is a money judgment. Ohio Casualty must pay PIM now for money wrongfully withheld in the past, and nothing will change the Bankruptcy Court's finding in this regard: that is a money judgment based upon that court's declaration of the rights of the parties under N.J.S.A. 17:22–6.14a. Though the order is interlocutory in the sense that the adver-

13. Indeed, as the Bankruptcy Court pointed out, PIM could not have misappropriated the post-April 1996 renewal commissions because PIM never received those commissions.

14. As explained earlier in this Opinion, the policy statement embodied in the *Universal Brokerage* case does not mean that this was a

termination within N.J.S.A. 17:22–6.14a(e) that would automatically end PIM's right to renewal commissions, but it could have an effect on the Bankruptcy Court's determination of whether to impose equitable remedies like a constructive trust.

sary proceeding continues, it is practically final because nothing in the remaining proceedings will change the Bankruptcy Court's determination that Ohio Casualty must pay PIM continuing commissions. The Bankruptcy Court may decide in the remaining proceedings to order Ohio Casualty to pay PIM additional sums, but the Bankruptcy Court's resolutions that the termination was under subsection (d) and that Ohio Casualty must pay commissions to PIM are final. In any event, pre-judgment interest is calculated "in the same amount and manner provided for by" the post judgment interest section of the New Jersey Court Rules, which provides that interest is applicable to the "awards and orders for the payment of money." Rule 4:42–11(a) and (b). Prejudgment interest applies in situations just like this.

 Prejudgment interest may be awarded on contract claims in the discretion of the Court. *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 478, 541 A.2d 1063 (1988). "The 'equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another.'" *North Bergen Rex Transport, Inc. v. Trailer Leasing Co., a Div. of Keller Systems, Inc.*, 158 N.J. 561, 574–75, 730 A.2d 843 (1999) (internal citation omitted). The Bankruptcy Court chose to award prejudgment interest both to compensate PIM for the loss of income that would have been earned if the commissions had been paid earlier and to discourage Ohio Casualty from similarly delaying payment in the future, both of which are proper considerations in determining whether to grant prejudgment interest. *See Salas v. Wang*, 846 F.2d 897, 907 (3d Cir.1988) (quoting *Ruff v. Weintraub*, 105 N.J. 233, 244–45, 519 A.2d 1384 (1987)).

The decision is a discretionary one. *Liberty Lincoln–Mercury v. Ford Motor Co.*, 134 F.3d 557, 574 (3d Cir.1998). Given that this Court has already found that the Bankruptcy Court did not err in ruling

that PIM was not terminated because of gross misconduct or failure to pay over premiums due to Ohio Casualty, this Court cannot say that the Bankruptcy Court's decision to award prejudgment interest represents a "manifest denial of justice." *Id.*

 Nor did the Bankruptcy Court err by deciding not to suspend prejudgment interest during periods of "judicial stay or delay." The Bankruptcy Court correctly recognized that New Jersey courts would likely suspend the accrual of prejudgment interest during stays of proceedings which are no fault of the parties. *See Dall'Ava v. H.W. Porter Co.*, 199 N.J.Super. 127, 130–31, 488 A.2d 1036 (App.Div.1985). However, suspension is only warranted in "exceptional circumstances." *See Salas*, 846 F.2d at 907 (quoting *Ruff*, 105 N.J. at 244–45, 519 A.2d 1384). Those circumstances might exist where "plaintiff is at fault or the litigation is delayed by court order ... or where defendant is not fully insured." *Salas*, 846 F.2d at 907 (quoting *Pavoll v. Island Petroleum*, 204 N.J.Super. 99, 103, 497 A.2d 919 (Law Div.1985)) (citations omitted).

According to the New Jersey Supreme Court in *Ruff*, exceptional circumstances exist " 'only where it is demonstrated that the policy, spirit and intent of the rule are patently inapposite to the circumstances at hand.'" *Ruff*, 105 N.J. at 245, 519 A.2d 1384. Here, the Bankruptcy Court found that such a suspension was inappropriate in this case because a denial of interest "would serve only to reward Ohio for advancing unsubstantial arguments, requiring extensive litigation, in its attempt to defeat the debtor's statutory entitlement to commissions for servicing Ohio insureds belonging to the debtor. Ohio has benefitted from the retention of commissions for nearly four years, and cannot be so unjustly enriched." (01/05/00 Letter Opinion at 13–14.) The Bankruptcy Court thus found that it was not inapposite to the spirit or purpose of the prejudgment interest rule to require Ohio Casualty to pay interest

during the time periods of those delays which were caused by its own factually baseless arguments or unnecessary contentions. This Court cannot say that the Bankruptcy Court abused its discretion and caused manifest injustice by this decision.

Therefore, the Bankruptcy Court's decision to award prejudgment interest will be affirmed. As the parties do not contest the method of calculation or the quantum of interest owed, those aspects of the Bankruptcy Court rulings will be upheld as well.

### F. Contempt

In addition to addressing Ohio Casualty's request for a stay pending appeal, the Bankruptcy Court's November 17, 1999 Letter Opinion addressed the Order to Show Cause for contempt. The Bankruptcy Court first explained that Ohio Casualty did not turnover the commissions owed in the time allotted by the Bankruptcy Court's previous orders. As the Bankruptcy Court noted, by September 15, 1999 the Bankruptcy Court had issued its opinions explaining that commissions were to be paid, but the order was delayed until October 14, 1999 because a contest regarding the form of order ensued. All parties received the order by fax the next day. Ohio Casualty then requested a telephone conference, which was held on October 20, 1999. At that conference, Ohio Casualty did request an extension of time to file an appeal and a stay pending completion of the adversary proceeding, but Ohio Casualty did not at that time request a stay pending appeal. Both of Ohio Casualty's requests were denied in an October 22, 1999 Letter Opinion, issued on the same day that, by virtue of the October 14, 1999 Order, Ohio Casualty was ordered to turnover the commissions. On October 25, 1999, Ohio Casualty filed a notice of appeal, and it simultaneously submitted to the Bankruptcy Court a motion for a stay pending appeal, which was made returnable three weeks later instead of in a shortened time period.

The Bankruptcy Court, recalling this history, found that Ohio Casualty could have, but did not, seek a stay pending appeal in a timely fashion, "e.g., during the telephone conference call on October 20, 1999, but failed to do so." The Bankruptcy Court further found that Ohio Casualty counsels' explanation that they were on trial during the week of October 20th and had not decided yet, by the time of the October 20th phone call, whether they would appeal, did not excuse their violation of the court's order. Even if the Court factored in the ten-day automatic stay of Fed.R.Civ.P. 62(a), applicable through Bankruptcy Rule Civil Procedure 7062, the Bankruptcy Court found, the "automatic stay" would have expired on October 25, 1999, and "[t]he mere filing of a notice for stay pending appeal, returnable three weeks later, does not act to ameliorate the violation." (11/17/99 Letter Op. at 17–18.) In a November 23, 1999 Letter Opinion, the Bankruptcy Court elaborated that it deemed Ohio Casualty's actions willful, meaning "a voluntary act which was not accidental." (11/23/99 Letter Op. at 2.)

After receiving billing statements from PIM's attorneys and receiving objections to particular billing requests, on December 1, 1999, the Bankruptcy Court ordered Ohio Casualty to pay PIM $3,202.00 in attorneys fees in connection with the Order to Show Cause. The Bankruptcy Court also ordered Ohio Casualty to turn over the commissions by November 22, 1999, with a daily sanction of $100 a day beginning on November 23, 1999 for every day the commissions remained unpaid. That order was halted by this Court's grant of a temporary stay pending appeal.

Ohio Casualty filed objections to the Bankruptcy Court's findings of fact and conclusions of law as to contempt. More specifically, Ohio Casualty contends that the Bankruptcy Court erred in exercising jurisdiction to issue a civil contempt order in a non-core proceeding, by finding that

the relief sought by PIM was more akin to injunctive relief, by finding that Ohio Casualty had ample opportunity to seek a stay pending appeal during the October 20, 1999 conference call, by concluding that the mere filing of a notice for stay pending appeal returnable three weeks later does not act to ameliorate contempt of the October 14, 1999 Order, and by holding that Ohio Casualty intentionally and willfully failed to turnover the commissions after being ordered to do so.

 Federal Bankruptcy Rule 9020 gives bankruptcy judges the power to hold parties in contempt:

> Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule,[15] may be determined by the bankruptcy judge only after a hearing on notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose. If the contempt charged involves disrespect or criticism of a bankruptcy judge, that judge is disqualified from presiding at the hearing except with the consent of the person charged.

Fed. R. Bank. P. 9020(b). The Rule makes no distinction between core and non-core proceedings, but rather indicates that the Bankruptcy Court has power to issue contempt findings. The Bankruptcy Court's contempt finding is a final order unless timely objections are filed:

> The order shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court unless, within the 10 day period, the entity named therein serves and filed objections prepared in the manner provided in Rule 9033(b). If timely objections are filed, the order shall be reviewed as provided in Rule 9033.

Fed. R. Bank. P. 9020(c). Under Rule 9033, once the party held in contempt identifies to which findings of fact and conclusions of law it objects, the opposing party has ten days in which to respond. Fed. R. Bank. P. 9033(b). The objecting party also arranges for designated portions of the record to be transmitted to the district judge for review. *Id.* Thereafter, the district judge

> shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

Fed. R. Bank. P. 9033(d).[16]

 Therefore, the Bankruptcy Court did have jurisdiction to issue a con-

---

**15.** Subdivision (a) provides that the Bankruptcy Court may summarily make a finding of contempt when the contempt is committed in the presence of the bankruptcy judge.

**16.** PIM urges this Court to adopt the view that this Court's review of the Bankruptcy Court's contempt finding should be for clear error instead of de novo. PIM argues that Rule 9033 is titled "Review of Proposed Findings of Fact and Conclusions of Law in Non–Core Proceedings" and that this contempt finding was issued within a core, not a non-

core proceeding, thus making Rule 9033 inapplicable. This Court need not comment on whether this was a core or non-core proceeding. Though Rule 9033, in the usual case, applies only for review of findings in non-core proceedings, Rule 9020(c) states that if timely objections are filed to contempt orders, the district court shall review the orders "as provided in Rule 9033." Rule 9020(c)'s commandment that the strictures of Rule 9033 be followed in these circumstances makes no distinction between core and non-core pro-

tempt finding, and this Court exercises de novo review of the findings of fact and conclusions of law made by the Bankruptcy Court in holding Ohio Casualty in contempt. Exercising that de novo review, this Court declines to adopt the Bankruptcy Court's holding that Ohio Casualty was in contempt of the Bankruptcy Court's October 14, 1999 Order. This Court disagrees with the Bankruptcy Court's conclusion that Ohio Casualty failed to comply with the Bankruptcy Court's order by waiting until October 25, 1999 to file a motion for a stay pending appeal. Though the Bankruptcy Court's October 14, 1999 Order ordered Ohio Casualty to turn over past due commissions by October 22, 1999, Ohio Casualty benefitted from the ten-day automatic stay on bankruptcy court orders set out in Federal Rule of Bankruptcy Procedure 7062.[17]

Nothing in Fed. R. Bank. P. 7062 or Fed.R.Civ.P. 62(a) indicates that the calculation of this time period is excepted from the bounds of Federal Rule of Civil Procedure 6(a). *See KRW Sales, Inc. v. Kristel Corp.*, 154 F.R.D. 186, 188 (N.D.Ill. 1994) (deciding, as a matter of first impression that Rule 6(a) applies to the automatic stay period). That rule provides that in computing

any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday.... When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation....

Fed.R.Civ.P. 6(a). In the instant case, the Bankruptcy Court entered its hybrid money judgment/injunctive relief order on Thursday, October 14, 1999. Excluding weekends, that time period expired on Thursday, October 28, 1999. Parties cannot be expected to pay a money judgment if they have filed an appeal and a motion for a stay pending appeal from that judgment, until a ruling is reached on the motion for stay pending appeal. Because Ohio Casualty filed a motion for a stay pending appeal during the ten-day automatic stay, as computed pursuant to Rule 6(a), on October 25, 1999, this Court cannot consider Ohio Casualty to have acted in contempt of the Bankruptcy Court's October 14, 1999 turnover order. This Court

---

ceedings. *See also In re Carrico*, 214 B.R. 842, 845 (6th Cir. BAP 1997) (Rule 9020(c) means that any contested contempt order will be subject to the district court's de novo review). When contempt orders are contested, Rule 9033 acts to set the procedures and standard for review.

17. Rule 7062 provides that

Rule 62 F.R.Civ.P. applies in adversary proceedings. An order granting relief from an automatic stay provided by § 362, § 922, § 1201, or § 1301 of the Code, an order authorizing or prohibiting the use of cash collateral or the use, sale or lease of property of the estate under § 363, an order authorizing the trustee to obtain credit pursuant to § 364, and an order authorizing the assumption or assignment of an executory contract or unexpired lease pursuant to § 365 shall be additional exceptions to Rule 62(a).

Fed.R.Civ.P. 62(a) provides that provides that

Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry. Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction or in a receivership action, or a judgment or order directing an accounting in an action for infringement of letters patent, shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal. The provisions of subdivision (c) of this rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal.

*Id.* None of the exceptions in Rule 7062 or § 62(a) apply in this case.

will therefore vacate the Bankruptcy Court's contempt findings dated November 17, 1999 and November 23, 1999, as well as the Order of December 1, 1999 awarding counsel fees as a contempt sanction.

III. *CONCLUSION*

For the foregoing reasons, this Court will affirm the Bankruptcy Court's order that Ohio Casualty turn over renewal commissions, plus interest, to PIM, but will set aside the Bankruptcy Court's contempt order. This Court holds that the Bankruptcy Court's declaratory judgment that Ohio Casualty's termination of PIM was governed by N.J.S.A. 17:22–6.14a(d), and that PIM was therefore entitled to receive commissions upon post-termination policy renewals, was correct and is affirmed. Though the Bankruptcy Court erred in assuming that a termination under N.J.S.A. 17:22–6.14a(d) could not transform into a termination under N.J.S.A. 17:22–6.14a(e) before the stated effective date of the subsection (d) termination, that error was harmless because the record contains no evidence from after November 15, 1993 and before March 1, 1994 that shows that the termination changed in character before the subsection (d) termination's stated effective date arrived. The Bankruptcy Court correctly held that recoupment was not warranted in the absence of a single, integrated transaction, and its finding that the pre- and post-petition debts in this case were not part of a single, integrated transaction was not clearly erroneous. Nor did the Bankruptcy Court abuse its discretion when it decided that it would not grant a constructive trust over the renewal commissions, despite PIM's earlier wrongful acts, because PIM''s wrongful acts did not occur with respect to the personal automobile insurance policies on which the renewal commissions were earned but unpaid. Therefore, this Court will affirm the judgment of the Bankruptcy Court. Likewise, this Court will affirm the Bankruptcy Court's order to pay interest on the commissions.

Further, for reasons stated above, this Court will not adopt the Bankruptcy Court's finding that Ohio Casualty is in contempt of the Bankruptcy Court's October 14, 1999 Order, and thus that finding and order to pay attorneys' fees as punishment is vacated.

Additionally, this Court will dissolve the stay entered herein pending appeal on November 22, 1999 and extended on January 21, 2000, and the Bankruptcy Court's July 30, 1999 and October 14, 1999 orders will take effect. Ohio Casualty shall forthwith pay PIM the amount of $228,933.29, plus $30,382.66 in back owed interest for a total of $259,215.95 as of October 14, 1999, plus additional commissions accruing since October 14, 1999. The accompanying Order shall direct the Clerk of Court to withdraw the sum of $259,215.95 from the Registry of Court (drawing upon the sum of $275,-000 deposited by Ohio Casualty pursuant to the Court's Order of November 19, 1999 as extended by the Order of November 24, 1999), and to make payment of this sum ($259,215.95) on March 14, 2000, to Professional Insurance Management, forwarding same to PIM's attorneys, Samuel Mandel, Esquire and Michael A. Zindler, Esquire. The accompanying Order shall also direct that Ohio Casualty calculate and certify the amount of additional interest due since October 14, 1999 commissions and to pay same, together with the amount of postOctober 14, 1999 commissions due to date, and pay same to Professional Insurance Management in full within twenty (20) days hereof, and upon the twentieth (20th) day of each month thereafter for commissions earned during the previous month.