

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-1-2002

# In Re: Prof Ins Mgt

Precedential or Non-Precedential:

Docket No. 00-5201

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: Prof Ins Mgt " (2002). *2002 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 1, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5201

IN RE: PROFESSIONAL INSURANCE MANAGEMENT,
        Debtor

PROFESSIONAL INSURANCE MANAGEMENT

v.

THE OHIO CASUALTY GROUP
OF INSURANCE COMPANIES;
THE OHIO CASUALTY INSURANCE;
OHIO LIFE INSURANCE COMPANY;
OHIO SECURITY INSURANCE COMPANY
and OCASCO BUDGET;
WEST AMERICAN INSURANCE COMPANY;
AMERICAN FIRE AND CASUALTY COMPANY,
        Appellants

On Appeal from the United States District Court
For the District of New Jersey
(No. 99-cv-05919 and No. 00-cv-00640)
District Judge: Honorable Jerome B. Simandle

Argued: May 14, 2001

Before: SLOVITER, AMBRO, and GARTH, Circuit Ju dges

(Filed: April 1, 2002)

        Charles X. Gormally (Argued)
        Carl J. Soranno (Argued)
        Brach, Eichler, Rosenberg, Silver,
         Bernstein, Hammer & Gladstone
        101 Eisenhower Parkway
        Roseland, New Jersey 07068

        Attorneys for Appellants
        The Ohio Casualty Group of
        Insurance Companies, et al.

        Michael A. Zindler
        Teich, Groh, Frost & Zindler
        691 State Highway 33
        Trenton, New Jersey 08619

        Samuel Mandel (Argued)
        136 West Route 38
        Moorestown, New Jersey 08057

        Attorneys for Appellee
        Professional Insurance Management

OPINION OF THE COURT

AMBRO, Circuit Judge:

The primary issue presented by this appeal, stemming
from a tortured procedural mess, is whether an insurance
company must turn over to its terminated agent
$259,315.95 in accrued commissions and interest, plus
additional commissions that continue to be earned. The
answer hinges on the interpretation of New Jersey's Agency
Termination Statute found at N.J. Stat. Ann. S 17:22-6.14a
(West 2000), a matter of first impression in this Court.1

_____

1. Because we recognized that this issue was one of first impression in
New Jersey, a majority of the panel granted a motion to certify the issue
under New Jersey Court Rule 2:12A to the New Jersey Supreme Court.
The motion had been granted just prior to oral argument initially
scheduled for December 13, 2000. As a consequence, we filed a Petition
for Certification with the New Jersey Supreme Court on January 24,
2001. On February 21, 2001, the New Jersey Supreme Court denied our
Petition, thereby making necessary this opinion.

2

Specifically, the parties call upon us to resolve the question
of whether The Ohio Casualty Group of Insurance
Companies ("Ohio Casualty") terminated its agent,
Professional Insurance Management ("PIM"), essentially at
will or, instead, for gross and willful misconduct or failure
to pay over to Ohio Casualty moneys due after receipt of a
written demand therefor. See N.J. Stat. Ann.S 17:22-
6.14a(d), (e). The Bankruptcy Court ruled, and the District
Court affirmed, that the termination was at will. The
consequence of this ruling is that New Jersey's Agency
Termination Statute requires Ohio Casualty to pay PIM
commissions on all policies for one year following
termination, and on automobile insurance policy renewals
so long as PIM services the accounts. See N.J. Stat. Ann.
S 17:22-6.14a(d), (l). Under a contrary ruling, PIM would
have no right to these commissions.

The remaining issues on appeal arise from the ruling that
the termination was at will, namely, (1) whether Ohio
Casualty can successfully interpose the equitable remedy of
recoupment against moneys PIM owed prior to its petition
under Chapter 11 of the Bankruptcy Code, and (2) whether
PIM is entitled to pre-judgment interest on the
commissions.

For the reasons that follow, we vacate the order of the
District Court requiring Ohio Casualty to turn over to PIM
commissions due and accruing, plus interest. We remand
to the Bankruptcy Court to apply to the facts of this case
the legal determination that the initial at-will termination
can become a termination for cause between the notice of

termination and the effective termination date. We also vacate the orders denying the equitable remedy of recoupment and awarding PIM pre-judgment interest, pending the resolution of this question by the Bankruptcy Court on remand.2

---

2. The claims of constructive trust and contempt of court addressed by the District Court were not raised on appeal. Therefore, we render no opinion on those issues and the orders with respect to each remain unchanged.

I. Factual and Procedural Background

The facts of this case are set out at length in previous opinions of this Court3 and the District Court,4 and the letter opinions of the Bankruptcy Court dated July 12, 1999 and October 22, 1999. The following discussion recounts the factual history bearing on the matters in this appeal. Despite our shortened recounting of the facts, they nonetheless remain complex.

PIM is a New Jersey-licensed insurance broker and agent. In 1980, PIM entered into an agency agreement with Ohio Casualty that permitted PIM to market Ohio Casualty's personal and commercial insurance policies. This agreement permitted Ohio Casualty to cancel the contract on 90 days notice and also reads in relevant part:

> The Company [Ohio Casualty], in the exercise of the right reserved to it above, may, at its option, retain all commissions which are payable or which may become payable under contracts of insurance represented by such expirations, or renewals thereof, and apply same against the amount of the Agent's [PIM's] indebtedness to the Company, or may sell, assign, transfer or otherwise dispose of such expirations to any other agent or broker. If, in either event, the Company does not realize sufficient return to satisfy Agent's indebtedness to the Company in full, the Agent shall remain liable for the unpaid balance. Amounts realized by the Company in excess of such indebtedness, less expenses incurred by the Company in handling or other disposition of such expirations, shall be paid to the Agent.
>
> . . . This agreement may be suspended or canceled for non-payment of balances due. During suspension, commissions due and payable to the Agent for Automatic Renewal type policies will be applied against balances due, to the extent of the indebtedness.

---

3. See In re Professional Ins. Management, 130 F.3d 1122 (3d Cir. 1997).

4. See Professional Ins. Management v. The Ohio Cas. Group of Ins. Cos., 246 B.R. 47 (D.N.J. 2000).

In re Professional Ins. Management, No. 94-1312, letter op. at 10 (Bankr. D.N.J. July 12, 1999).

PIM located customers, ascertained their insurance needs, and sold them Ohio Casualty policies. For personal automobile insurance policies, Ohio Casualty collected premiums directly from the policyholders and sent PIM its sales commissions. For other types of insurance, namely commercial lines, PIM collected the premiums, deducted its commissions, and then forwarded the balance to Ohio Casualty.

Each month, a reconciliation process occurred whereby Ohio Casualty provided PIM an account statement detailing each insurance account, the type of insurance, the gross premium, the commission rate, and details of the amounts currently due, past due and due in the future. PIM would customarily receive Ohio Casualty's monthly statement at the beginning of each month. PIM would then compare its own records to the statement, and would reconcile the items contained in the currently due column. If PIM disagreed with an entry, it would line off the entry and provide an explanation and documentation in support. Ohio Casualty would then carry forward the item into the past due column where it would remain until Ohio Casualty researched the item and the parties resolved the issue. PIM's reconciliation and payments were due by the 15th of the month. If an item that Ohio Casualty determined was due was not paid after a "please remit" notice, an Ohio Casualty account technician would issue an "open item letter" demanding payment and, at times, threatening suspension unless payment was received by a certain deadline. The relevant point is that in the reconciliation process the parties mixed the policy types and took credits against all policies in one monthly transaction, as per the agency agreement. In addition, in the case of agent indebtedness, the agency agreement specifically called for the application of commissions due against balances due regardless of the policy type.

In order to make its product more attractive in a highly competitive market, Ohio Casualty formed its own premium finance company, Ocasco. Ocasco offered to finance large premiums, particularly those in the commercial market, at

no interest for premiums over $10,000 and at a nominal interest rate for premiums under $10,000. The vast majority of premiums on commercial policies sold by PIM, 96%-98% of its premiums in 1992 and 1993, were financed. In those cases, an agreement was prepared by the agent -- PIM, signed by the insured, and sent to Ocasco. Ocasco would process the agreement and send a voucher back to PIM. PIM then forwarded the voucher in lieu of

cash to Ohio Casualty when it made its monthly payments. Because PIM could not deduct its commissions from the vouchers directly, it was using the small percentage of cash receipts to pay its commissions. The volume of premiums PIM financed through Ocasco and the length of voucher processing time created accounting difficulties for PIM. As a result, PIM would credit vouchers prematurely and use vouchers-in-hand to credit premiums in the pipeline. The latter practice was permitted by an agreement between Ocasco and PIM.

Ohio Casualty complained of PIM's accounting procedures as early as 1989. PIM typically had 25% or more of its amount due in the past due column, and PIM's accounting practices with respect to past due balances and credits were the subject of at least nine letters from Ohio Casualty. After much discussion between the parties, Ocasco agreed to send its vouchers directly to Ohio Casualty. Despite this improvement and PIM's clarifications of its past due balances, accounting problems continued into 1993. PIM was twice threatened with suspension that year.

Finally, on November 15, 1993, Ohio Casualty sent the following letter of termination to PIM:

> We have had a lot of conversations about continued existing problems with your agency regarding clearing accounting differences in a timely fashion resulting in a continued high "over 90 days" debt and continued problems with your agency reimbursing Ocasco Budget promptly on accounts that have been canceled. On many, the Accounting Department had to reimburse Ocasco and now since we have requested your agency not to use Ocasco on new accounts, we are beginning

6

> to get similar problems and requests from other premium finance companies.
>
> Along with the above problems you are heading for the third consecutive unprofitable year (twelve months 86.9% thru October 30, 1993) and a six year Loss Ratio of 62.6%.
>
> At this time it is necessary that I advise you that we are terminating your Agency Agreement effective March 1, 1994 and that you will no longer have the authority to write new business or bind coverage effective November 19, 1993. We will honor all prior binding commitments, subject to our underwriting rules, made prior to that date.

In re Professional Ins. Management, No. 94-1312, letter op. at 32 (Bankr. D.N.J. July 12, 1999). This initial termination letter was followed by an "official form letter" dated November 19, 1993 establishing the procedures for termination and renewals. Attached to this form letter were

copies of the agency termination notice and offer letters that Ohio Casualty intended to send to PIM's insureds. Id. at 33. The forms submitted to the New Jersey Department of Insurance noted that the reasons for PIM's termination were poor loss ratio, continued accounting differences, and continued payment problems with premium finance companies and canceled accounts. Id. at 34. The termination was effective on March 1, 1994. Thereafter, PIM was to continue to receive commissions on commercial renewals for one year following termination and on automobile policy renewals so long as PIM serviced the accounts, in accordance with the notice of termination and the New Jersey Agency Termination Statute.5

_____

5. The New Jersey Agency Termination Statute, codified at N.J. Stat. Ann. S 17:22-6.14a, governs the rights of a terminated agent. The relevant subsections (d), (e) and (l) provide:

> d. Termination of any such contract for any reason other than one excluded herein shall become effective after not less than 90 days' notice in writing given by the company to the agent and the Commissioner of Banking and Insurance. No new business or changes in liability on renewal or in force business, except as

7

At the time Ohio Casualty sent the notice of termination, it claimed that PIM owed over $200,000. In November and

_____

> provided in subsection l. of this section, shall be written by the agent for the company after notice of termination without prior written approval of the company. However, during the term of the agency contract, including the said 90-day period, the company shall not refuse to renew such business from the agent as would be in accordance with said company's current underwriting standards. The company shall, during a period of 12 months from the effective date of such termination, provided the former agent has not been replaced as the broker of record by the insured, and upon request in writing of the terminated agent, renew all contracts of insurance for such agent for said company as may be in accordance with said company's then current underwriting standards and pay to the terminated agent a commission in accordance with the agency contract in effect at the time notice of termination was issued. Said commission can be paid only to the holder of a valid New Jersey insurance producer's license. In the event any risk shall not meet the then current underwriting standards of said company, that company may decline its renewal, provided that the company shall give the terminated agent and the insured not less than 60 days' notice of its intention not to renew said contract of insurance.

> e. The agency termination provisions of this act shall not apply to those contracts:

> (1) in which the agent is paid on a salary basis without commission or where he agrees to represent exclusively one company or to the termination of an agent's contract for insolvency, abandonment, gross and willful misconduct, or failure to pay over to the company

moneys due to the company after his receipt of a written demand therefor, or after revocation of the agent's license by the Commissioner of Banking and Insurance; and in any such case the company shall, upon request of the insured, provided he meets the then current underwriting standards of the company, renew any contract of insurance formerly processed by the terminated agent, through an active agent, or directly pursuant to such rules and regulations as may be promulgated by the Commissioner of Banking and Insurance; . . .

\* \* \*

l. A company which terminates its contractual relationship with an agent subject to the provisions of subsection d. of this section shall, at the time of the agent's termination, with respect to insurance

8

December of 1993, Ohio Casualty continued to send PIM monthly statements and reconciliations and PIM continued to make payments. Correspondence between Ohio Casualty and PIM confirmed Ohio Casualty's intent to renew commercial policies through PIM for one year. In January of 1994, however, PIM filed suit against Ohio Casualty and shortly thereafter the statements and accounting practices between them broke down completely. Id. at 34. Also in January of 1994, PIM began to take improper credits against moneys owed to Ohio Casualty, a fact not subject to dispute on appeal. The essence of the impropriety was

---

covering an automobile as defined in subsection a. of section 2 of P.L.1972, c. 70 (C.39:6A-2), notify each named insured whose policy is serviced by the terminated agent in writing of the following: (1) that the agent's contractual relationship with the company is being terminated and the effective date of that termination; and (2) that the named insured may (a) continue to renew and obtain service through the terminated agent; or (b) renew the policy and obtain service through another agent of the company.

Notwithstanding any provision of this section to the contrary, no insurance company which has terminated its contractual relationship with an agent subject to subsection d. of this section shall, upon the expiration of any automobile insurance policy renewed pursuant to subsection d. of this section which is required to be renewed pursuant to section 3 of P.L.1972, c. 70 (C.39:6A-3), refuse to renew, accept additional or replacement vehicles, refuse to provide changes in the limits of liability or refuse to service a policyholder in any other manner which is in accordance with the company's current underwriting standards, upon the written request of the agent or as otherwise provided in this section, provided the agent maintains a valid New Jersey insurance producer's license and has not been replaced as the broker of record by the insured. However, nothing in this section shall be deemed to prevent nonrenewal of an automobile insurance policy pursuant to the provisions of section 26 of P.L.1988, c. 119 (C.17:29C-7.1).

The company shall pay a terminated agent who continues to service policies pursuant to the provisions of this subsection a

commission in an amount not less than that provided for under the agency contract in effect at the time the notice of termination was issued.

N.J. Stat. Ann. S 17:22-6.14a(d), (e) and (l) (West 2000).

that PIM applied credit for commissions it earned on personal automobile policy lines against the commercial premiums it collected on behalf of Ohio Casualty, claiming that Ohio Casualty had wrongly withheld these same personal automobile policy lines commissions beginning in October of 1993.

In a letter dated May 26, 1994, nearly three months after PIM was effectively terminated, Ohio Casualty demanded that PIM surrender to it the agency records, declared that PIM was indebted to it for $294,284.29, and demanded payment. Also in May, PIM attempted to sell its book of business ("Book of Business") to Anderson Jackson Metts ("AJM"). In anticipation of the sale, PIM brokered certain contracts to AJM. After Ohio Casualty successfully obtained injunctive relief to have the proceeds of the sale, if any, placed in escrow, the sale fell through.

On August 5, 1994, PIM filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. S101, et seq.6 PIM's indebtedness to Ohio Casualty as of the time of the petition was later fixed at $252,642.40.7 On August 15, 1994, Ohio Casualty sent letters to PIM's customers informing them of the termination of the agency relationship and of their options. Pursuant to a Bankruptcy Court order under which the status quo was maintained, Ohio Casualty took over PIM's Book of Business in September of 1994, and employed AJM as the servicing agent. This order was appealed to the District Court. On June 30, 1995, the District Court affirmed the Bankruptcy Court's ruling that Ohio Casualty

---

6. Under subsection (e) of the Agency Termination Statute, the termination of an agent for insolvency precludes the agent's collection of commissions pursuant to subsection (d). In this case (and without considering the effect of the S 365(e)(1)(A) of the Bankruptcy Code banning, inter alia, the termination of a contract solely because of insolvency), because PIM filed for bankruptcy five months after the effective date of termination, its insolvency could not have been a reason for its termination and subsection (e) does not apply on this basis.

7. The fixing of Ohio Casualty's pre-petition claim was resolved on September 10, 1996, after lengthy hearings on PIM's motion to expunge Ohio Casualty's claim. In re Professional Ins. Management, No. 94-1312, letter op. at 35 n.53 (Bankr. D.N.J. July 12, 1999).

owned the Book of Business, but reversed and remanded as

to whether it could be sold or transferred.

On March 7, 1996, the Bankruptcy Court reversed itself and held that Ohio Casualty had an unperfected security interest in PIM's Book of Business, and directed the Book of Business to be returned to PIM effective April 1, 1996. On April 19, 1996, the Bankruptcy Court (1) ordered Ohio Casualty to rescind notices of non-renewal to 65 of 69 auto policy holders under New Jersey's 2 for-1 requirement;8 (2) tolled the 12-month statutory period giving PIM a right to renewals on commercial policies from April 1, 1996 to June 30, 1996 (subtracting several months for PIM's delay in seeking relief from an earlier ruling); and (3) granted PIM the right to collect on commissions post April 1, 1996.9

On July 8, 1996, the District Court (Rodriguez, D.J.) affirmed the April 19, 1996 decision as to the tolling period and to Ohio Casualty having an unperfected security interest in the Book of Business, but reversed the 2-for-1 decision and the rescission of the cancellation letters, and found Ohio Casualty had no perfected security interest in post-petition commissions owed to PIM. In re Professional Ins. Management, No. 96-2499, slip op. at 16, 25-26, 30 (D.N.J., July 8, 1996). The District Court further remanded to the Bankruptcy Court the issue of whether PIM's termination was covered under subsection (d) or (e) of the Agency Termination Statute. Id. at 15. This Court upheld the District Court's reversal with respect to the 2-for-1 ruling and the holding that the Bankruptcy Court could not

_____

8. New Jersey's 2-for-1 insurance regulation, which provides that for every New Jersey auto policy canceled the carrier must write two new policies, does not directly bear on this appeal. The issues arising during the period post-termination and prior to April 1, 1996, and the claim that Ohio Casualty terminated PIM in retaliation for PIM's refusal to violate the New Jersey Fair Automobile Insurance Reform Act of 1990, N.J. Stat. Ann. S 17:33B-1 (West 2000) (the"FAIR Act"), are before the Bankruptcy Court in a different proceeding.

9. Ohio Casualty contends on appeal that the proceeds of this sale and commissions earned on commercial policies pre-April 1, 1996 arise from the identical commercial expirations that PIM failed to remit premiums on pre-petition, and therefore recoupment should be ordered. Ohio Casualty's Motion to Expand the Record at 6.

order Ohio Casualty to pay commissions to PIM until the (d) or (e) determination was made. In re Professional Ins. Management, 130 F.3d 1122 (3d Cir. 1997).

In July of 1998, the Bankruptcy Court held seven days of hearings on the (d) versus (e) issue. In the midst of these hearings, Ohio Casualty issued a Notice of Discontinuance informing PIM that effective September 1, 1998, Ohio Casualty would stop accepting renewals and service requests from PIM for automobile policies under subsection (l) and would not pay PIM commissions. The Bankruptcy

Court enjoined this Notice of Discontinuance.

Throughout the hearings, the Bankruptcy Court limited its inquiry into the record to the period prior to November 15, 1993 -- the notice of termination date. The Bankruptcy Court found that, as of the month-end prior to the termination notice, only $24,774 of the $217,000 listed as due to Ohio Casualty prior to reconciliation was actually in the past due column, and of that amount only $1,930 was marked due and payable.10 Such a small amount of arrears, the Bankruptcy Court ruled, did not substantiate Ohio Casualty's claim that PIM was terminated for gross and willful misconduct or for failure to pay over premiums due under subsection (e) of the Agency Termination Statute. In re Professional Ins. Management, No. 94-1312, letter op. at 59-60 (Bankr. D.N.J. July 12, 1999). The Bankruptcy Court concluded that PIM's termination therefore fell under subsection (d) of the Agency Termination Statute, essentially the "at will" provision. This meant that PIM was entitled to renewal commissions for one year on all policies, subject to the tolling period instituted by the Bankruptcy Court, and for renewal commissions on automobile policies under subsection (l) of the statute for as long as PIM serviced those accounts.

In a Supplemental Decision on September 15, 1999, the Bankruptcy Court rejected Ohio Casualty's claims of recoupment and constructive trust, and on October 14, 1999, the Bankruptcy Court ordered that all commissions

_____

10. Support for the Bankruptcy Court's accounting for the reduction in the amount PIM owed Ohio Casualty at the time of the notice of termination is detailed in its July 12, 1999 letter opinion.

12

after April 1, 1996 be turned over to PIM. Ohio Casualty appealed and requested a stay. After Ohio Casualty failed to turn over the commissions, the Bankruptcy Court found Ohio Casualty in contempt in a letter opinion dated November 17, 1999. The Bankruptcy Court issued its final decision in the matter before us on January 5, 2000 in a letter opinion wherein it ruled that Ohio Casualty owes PIM commissions plus pre-judgment interest from April 1, 1996 forward, in the amount of $259,315.95.

The District Court affirmed the Bankruptcy Court's determination that PIM's termination fell under subsection (d) of the Agency Termination Statute and ruled that the Bankruptcy Court's failure to consider evidence of PIM's conduct between the time of notice and the time of termination was error, though harmless in the context of the District Court's analysis. Professional Ins. Management v. The Ohio Cas. Group of Ins. Cos., 246 B.R. 47, 65 (D.N.J. 2000). It affirmed the denial of recoupment and constructive trust and the award of prejudgment interest. Id. at 67, 69, 71. However, the District Court reversed the finding that Ohio Casualty was in contempt for failure to

turn over commissions to PIM on the ground that Ohio Casualty filed a timely appeal after the automatic ten-day stay. Id. at 73. This appeal followed.

II. Jurisdiction

As a threshold matter, we must be satisfied that we have appellate jurisdiction. Metro Transp. Co. v. North Star Reinsurance Co., 912 F.2d 672, 676 (3d Cir. 1990). At oral argument, we posed the question of the statutory basis for exercising jurisdiction in this case. To resolve this question, we sought supplemental briefing from the parties. Specifically, we asked whether we could exercise jurisdiction over an appeal based on the traditional jurisdiction provisions in 28 U.S.C. SS 1291-1292, the bankruptcy jurisdiction provision in 28 U.S.C. S 158(d), or whether we should otherwise exercise jurisdiction in light of the factors set forth in In re Blatstein, 192 F.3d 88, 94 (3d Cir. 1999). After reviewing the submissions of the parties, we conclude that jurisdiction is proper in this case under 28 U.S.C. S 158(d) and shall entertain the appeal.

13

In the context of an appeal from the District Court reviewing a Bankruptcy Court decision, our own jurisdiction is prescribed by S 158(d). Consequently, our review is limited to final orders and judgments of the bankruptcy courts and district courts: "The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a)11 and (b)12 of this section." 28 U.S.C. S 158(d). Although district courts may grant leave to appeal from interlocutory orders, no such power is granted to courts of appeals. In re White Beauty View, Inc. , 841 F.2d 524, 525 (3d Cir. 1988).

"The finality of the [orders] must be resolved with respect to the decisions of both the bankruptcy judge and the district court." Id. at 526 (citing In re Meyertech Corp., 831 F.2d 410, 413-14 (3d Cir. 1987)). Ordinarily in civil litigation only those orders that dispose of all issues as to all parties to the case are considered final. In re Meyertech Corp., 831 F.2d at 414. However, considerations unique to bankruptcy appeals have led us consistently in those cases to construe finality in a more pragmatic, functional sense than with the typical appeal. In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir. 1985). With this understanding,

> [w]e interpret finality pragmatically in bankruptcy
> cases because these proceedings often are protracted
> and involve numerous parties with different claims. To

_____

11. Subsection (a) of section 158 grants the District Court jurisdiction to hear appeals

> (1) from final judgments, orders, and decrees;

> (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
>
> (3) with leave of the court, from other interlocutory orders and decrees;
>
> of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

28 U.S.C. S 158(a).

12. This jurisdictional subsection is not implicated by this appeal.

> delay resolution of discrete claims until after final approval of a reorganization plan, for example, would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan.

In re White Beauty View, 841 F.2d at 526.

This relaxed sense of "practical finality" is not without limitation. It must be balanced against our traditional antipathy toward piecemeal appeals.13 In re Meyertech Corp., 831 F.2d at 414. For example, although an order of the bankruptcy court expunging a creditor's claim is final, Walsh Trucking Co., Inc. v. Insurance Co. of North America, 838 F.2d 698, 701 (3d Cir. 1988), an order of the bankruptcy court finding the debtor's attorneys subject to sanctions (but not determining the amount or form of the penalty) is not final, In re Jeannette Corp., 832 F.2d 43 (3d Cir. 1987). Similarly, in In re Brown, 803 F.2d 120 (3d Cir. 1986), we ruled that a district court order remanding to the bankruptcy court for a determination of damages was not a final order.

In this case, the District Court was satisfied that jurisdiction was proper either as an appeal of a final order of the Bankruptcy Court under 28 U.S.C. S 158(a) or as an appeal of an interlocutory order granting an injunction

---

13. Even within the context of S 1291, balancing "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other" is appropriate. Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 479 n.7 (1975). As the Supreme Court noted in Cox Broadcasting:

> [O]ur cases long have recognized that whether a ruling is "final" within the meaning of S 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the "twi-light zone" of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a "practical rather than a technical construction." Cohen v. Beneficial Industrial

Loan Corp., 337 U.S. 541, 546 (1949).

Id.

15

under 28 U.S.C. S 1292(a)(1).14 Professional Ins.

_____

14. The Bankruptcy Court order of July 30, 1999, pertaining to the applicability of subsection (e) of the Agency Termination Statute, provides in relevant part:

Ordered as follows:

>    1. That Ohio's cross-motion for an order declaring that N.J.S.A. 17:22-6.14a(e) restricts Debtor's entitlement to renewal commissions is denied;

>    2. That the provisions of N.J.S.A. 17:22-6.14a(d) apply regarding the termination of Debtor's agency relationship with Ohio;

>    3. That any other issues remaining for resolution shall proceed in accordance with this Court's Opinion filed July 12, 1999 . . . .

The Bankruptcy Court order of October 14, 1999, pertaining to the turnover of commissions and clarified in the letter opinion of October 22, 1999, reads in relevant part:

>    ORDERED that the Debtor is entitled to receive commissions due on its Ohio book of business from April 1, 1996 and continuing through and after the date of this Order; and it is further

>    ORDERED that Ohio be and is hereby directed to turnover to the Debtor within seven (7) days from the date of the entry of this Order, the sum of Two Hundred Sixteen Thousand Five Hundred Sixty-nine and 79/100 ($216,569.79) Dollars in direct bill commissions that have accrued since April 1, 1996 through July 26, 1999, as well as all direct bill commissions after July 26, 1999 to the date of this Order . . . and it is further . . .

>    ORDERED that Ohio be and is hereby directed to pay to the Debtor all direct bill commissions that accrue to the Debtor as a terminated agent under New Jersey law after the date of this Order, . . . and it is further . . .

>    ORDERED that the Debtor's claim for commissions due for the period August 1994 through April 1996 be and are hereby preserved and reserved pending a determination of Ohio's administration claim by this Court; and it is further

>    ORDERED that Ohio's application for a constructive trust to be imposed on the above commissions for its benefit be and is hereby denied; and it is further

>    ORDERED that Ohio's application for this Court to exercise its equitable powers to grant Ohio a right of recoupment from these commissions in order to satisfy the Debtor's pre-petition debt to Ohio be and is hereby denied . . . .

Management, 246 B.R. at 59-60. With respect toS 158(a),
the District Court noted that

> the Bankruptcy Court specifically declined to
> characterize the nature of the October 14, 1999 Order,
> "except to note that [it] was a final resolution of the
> debtors' motion for turnover of commissions from April
> 1, 1996, which motion was made in Adversary
> Proceeding No. 94-1312, and to recognize that
> additional issues remain to be heard in that proceeding
> . . . ."

Id. at 57 (citing In re Professional Ins. Management, No. 94-
1312, letter op. at 3 (Bankr. D.N.J. Oct. 22, 1999)). The
Bankruptcy Court also denied Ohio Casualty's request for
a stay of the October 14, 1999 Order pending resolution of
the remaining issues in the adversary proceeding because
none of the issues remaining in the case "relate to debtor's
entitlement to commissions since April 1, 1996." In re
Professional Ins. Management, No. 94-1312, letter op. at 3
(Bankr. D.N.J. Oct. 22, 1999).

Invoking the doctrine of "practical finality," the District
Court agreed that the issues decided by the Bankruptcy
Court were discrete and that "no effect or impact of those
decisions would change as a result of the Bankruptcy
Court's future ultimate decision as to whether PIM is
entitled to damages for wrongful termination." Professional
Ins. Management, 246 B.R. at 59. Therefore, the District
Court ruled that the Bankruptcy Court orders of July 30,
1999 and October 14, 1999 were final orders subject to its
review.

We agree with this conclusion. We note that Congress
had previously provided that orders in bankruptcy cases
finally disposing of discrete disputes within the larger case
may be immediately appealed, and that "a bankruptcy
court order ending a separate adversary proceeding is
appealable as a final order even though that order does not
conclude the entire bankruptcy case." In re Moody, 817
F.2d 365, 367-68 (5th Cir. 1987) (citing In re Saco Local
Development Corp., 711 F.2d 441, 445-46 (1st Cir.1983)).
The Bankruptcy Court's orders finally determined whether
Ohio was obligated to pay PIM commissions following the

termination of its agency agreement and the amount of that
obligation. PIM disagrees, contending that the order is
interlocutory and that additional, related issues remain to
be heard before the Bankruptcy Court. It is true that the
Bankruptcy Court is still considering the resolution of
significant issues between these two parties, specifically (1)
an adversary proceeding alleging Ohio Casualty's wrongful
termination of PIM under the FAIR Act, and (2) the

allegation that Ohio failed adequately to service the Book of Business pre-April 1, 1996, resulting in commissions owed to PIM during this period. However, we agree with the District Court that this appeal is entirely distinct and that the issues noted above are unaffected by our resolution of this appeal.15

Moreover, the two orders, considered together, effect a turnover of commissions, which is widely regarded as a final order for purposes of appeal.

> Following the lead of every circuit court that has considered the question directly or indirectly, we hold

---

15. Ohio Casualty submitted the recent decision of the New Jersey Supreme Court, R. J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 773 A.2d 1132 (N.J. 2001), pursuant to Federal Rule of Appellate Procedure 28(j), as possibly negating our authority to decide this matter on appeal. In Gaydos, the New Jersey Supreme Court held that the FAIR Act "does not create a private right of action for an agent to pursue a claim that it was wrongly terminated as a result of an insurer's alleged FAIRA violations." Id. at 1147. Instead, the FAIR Act vests enforcement powers exclusively with the Commissioner of Insurance. Id. The Court noted that the New Jersey Legislature did not adopt the FAIR Act to benefit insurance agents and insulate them from potential termination. Id. However, the Court held that the agent could assert a common-law contract claim for breach of the implied covenant of good faith and fair dealing stemming from the carrier's termination of the agency agreement, citing to N.J.S.A. 17:22-6.14a(d) -- the same statute at issue in this appeal. Id. at 1148. Because we conclude that the FAIR Act claim currently before the Bankruptcy Court will not be affected by our disposition of this case and because the Agency Termination Statute, enacted to protect the rights of terminated insurance agents, provides a common-law cause of action, the Courts below did not abuse their discretion in failing to defer to the Commissioner of Insurance. This matter was properly before the Bankruptcy and District Courts, and as an appeal of a final order is properly before us.

18

> that a bankruptcy court's turnover order, in a separate adversary proceeding, compelling a defendant to turn over property in his possession to the trustee in bankruptcy, is a final order and hence appealable as of right.

In re Moody, 817 F.2d at 366. See also In re Cash Currency Exchange, Inc., 762 F.2d 542, 546 (7th Cir. 1985); In re Flying W. Airways, Inc., 442 F.2d 320, 321 n.1 (3d Cir. 1971); Sproul v. Levin, 88 F.2d 866, 869 (8th Cir. 1937); cf. George A. Fuller Co. of P.R., Inc. v. Matta, 370 F.2d 679, 680 (1st Cir. 1967); O'Keefe v. Landow, 289 F.2d 465, 466 n.1 (2d Cir. 1961). We conclude that the effect of the Bankruptcy Court's determination that subsection (d) of the Agency Termination Statute was triggered by Ohio's termination of PIM, in conjunction with the turnover order, completely disposed before that Court of the issues under appeal. Therefore the Bankruptcy Court orders were final,

appealable orders to the District Court under 28 U.S.C.
S 158(a).16

Having concluded that the Bankruptcy Court orders were

_____

16. In addition, we agree that the District Court, sitting as an appellate court, was authorized to hear the appeal from the Bankruptcy Court as an appealable injunctive order under 28 U.S.C. S 1292(a), which provides:

> (a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:
>
> (1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court . . . .

28 U.S.C. S 1292(a)(1). Both the District Court and the Bankruptcy Court characterized the Bankruptcy Court orders as providing injunctive relief. "The injunctive character of these orders is . . . evident from the [larger, continuing order to pay commissions and] the duty imposed upon Ohio Casualty with respect to the ongoing accrual of PIM's commissions, namely, to pay them over as they are earned, now and in the future." Professional Ins. Management, 246 B.R. at 59.

final, we now briefly discuss the finality of the District Court order of February 29, 2000. That order:

> (1) affirmed the Bankruptcy Court order with respect to subsection (d) of the Agency Termination Statute;
>
> (2) affirmed the turnover of accrued commissions and interest and continuing commissions;
>
> (3) vacated the order holding Ohio Casualty in contempt for failure to pay over commissions;
>
> (4) directed the Clerk of Court to withdraw $259,215.95 from the registry of Court and make payment to PIM's counsel; and
>
> (5) ordered Ohio Casualty to calculate the additional interest and commissions due to date.

Professional Ins. Management, No. 99-5919, order (D.N.J. Feb. 29, 2000). Just as the Bankruptcy Court proceeding below fully adjudicated a specific adversary proceeding between the parties, the challenged order of the District Court does the same.17 Therefore, jurisdiction over this final order is proper in our Court pursuant to 28 U.S.C.S 158(d).

III. New Jersey's Agency Termination Statute

Having jurisdiction over this appeal, we now turn to the merits of the District Court's decision regarding New Jersey's Agency Termination Statute. "Because the District Court sat as an appellate court, reviewing an order of the Bankruptcy Court, our review of the District Court's determinations is plenary." In re Rashid, 210 F.3d 201, 205 (3d Cir. 2000). "In reviewing the bankruptcy court's determinations, we exercise the same standard of review as the district court." Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir.

_____

17. Notably, the District Court did not remand to the Bankruptcy Court for additional findings or legal determinations. Thus, the merits of the discrete adversary case before the District Court were finally adjudicated. As a result, we do not need to elaborate on the four factors set forth in In re Blatstein, 192 F.3d 88, 94 (3d Cir. 1999), which provides additional guidance on our jurisdiction where the District Court remands to the Bankruptcy Court in whole or in part.

20

1995). Therefore, we review the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof. In re Engel, 124 F.3d 567, 571 (3d Cir. 1997).

After reviewing the voluminous record before us, we conclude that both the Bankruptcy Court and the District Court correctly interpreted the provisions of the Agency Termination Statute to be predicated on the termination of an agency relationship. We agree with the District Court that an "at will" termination (under N.J. Stat. Ann. S 17.22-6.14a(d)) could morph into a "for cause" termination (under N.J. Stat. Ann. S 17.22-6.14a(e)) prior to the effective date of termination and that the Bankruptcy Court erred when it set the notice date as the relevant point of inquiry into whether the statute's "at will" or "for cause" provisions apply. However, we do not subscribe to the District Court's conclusion that the Bankruptcy Court's error was nonetheless harmless. Because neither the District Court nor the Bankruptcy Court considered the relevant conduct (PIM's failure to pay over premiums due between the date of notice and the effective date of termination) and whether Ohio Casualty recognized this conduct as a reason for termination (irrespective of whether it was aware of subsection (e)), the error was prejudicial and the case is remanded to the Bankruptcy Court.

A. Interpretation of the Statute

That New Jersey considers the insurance industry to be strongly affected by the public interest is demonstrated through its comprehensive regulation of the industry. In enacting the "No Fault Law," for example, it was the New Jersey Legislature's intent to provide insureds"the advantage of guaranteed renewals of indefinite duration with a particular company." Sheeran v. Nationwide Mutual

Insurance Co., Inc., 404 A.2d 625, 629 (N.J. 1979). With respect to New Jersey's Agency Termination Law, the Legislature was "primarily concerned with the rights of insurance agents. . . . The protection which it affords to the insured public, although important, is only secondary." Id. at 630. The Legislature enacted the statute to "regulate the termination of agency agreements between insurance companies and their independent agents." Cohen v. Home

Ins. Co., 230 N.J. Super. 72, 75 (App. Div. 1989). The legislative history and case law also reflect a concern "that New Jersey policyholders should not be deprived of the benefit of continued effective policy service by motivated agents." In re Terminated Aetna Agents, 248 N.J. Super. 255, 260 (App. Div. 1990), certif. denied, 126 N.J. 319 (1991). This case illustrates a point of conflict over the protection of the interests of agents and the public at the expense of the insurance carrier.

PIM's entitlement to renewal commissions, following the termination of its agency relationship with Ohio, is governed by New Jersey's Agency Termination Statute. As already noted, if Ohio terminated PIM because of gross and willful misconduct or failure to pay premiums due after written notice, New Jersey law would preclude PIM from receiving post-termination commissions or renewals. On the other hand, if Ohio terminated PIM at will, New Jersey law provides PIM with the right to renewal commissions on the commercial policies for one year, and automatic renewal commissions on personal automobile policies indefinitely.

Both the District Court and the Bankruptcy Court interpreted the exception to S 17:22-6.14a(d) created in (e) to apply specifically to terminations, as opposed to situations where an agent fails to remit premiums at some point after the termination of the agency relationship. What Ohio Casualty initially disputes is the Courts' construction of subsection (e) to include the phrase "or failure to pay over to the company moneys due to the company after his receipt of a written demand therefor, . . ." as a termination condition rather than an independent reason disqualifying the agent from receipt of commissions.

To aid in this interpretation, we turn first to general rules of statutory construction established by the United States Supreme Court. As a general rule, "the meaning of a statute must . . . be sought in the language in which the act is framed, and if that is plain . . . , the sole function of the courts is to enforce it according to its terms." Caminetti v. United States, 242 U.S. 470, 485 (1917); see, e.g., Vreeland v. Byrne, 370 A.2d 825 (N.J. 1977). In applying this rule, courts have generally agreed that where a legislature has "made a choice of language which fairly brings a given

situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." Sears, Roebuck & Co. v. United States, 504 F.2d 1400, 1402 (Cust. Ct. Pat App. 1974); see, e.g., Barr v. United States, 324 U.S. 83, 90 (1945); Vreeland, 370 A.2d at 832 (finding no room for judicial interpretation). The New Jersey Supreme Court upheld these principles of statutory construction in the insurance regulation context when it rejected a defendant's argument to rewrite the clear wording of New Jersey's No-Fault Act to exempt that defendant from its proscriptions. Sheeran, 404 A.2d at 628.

The District Court applied these general rules of statutory construction and agreed with the Bankruptcy Court's interpretation of the statute, noting that "[t]he plain and unambiguous language of subsection (e) . . . clearly establishes that subsection (e) applies if the termination is a result of gross and willful misconduct or failure to pay over funds; the causal relationship is a necessary predicate to subsection (e)'s applicability." Professional Ins. Management, 246 B.R. at 63 (italics in original). Upon review of the text, this reading is correct.

Ohio Casualty asserts that strict application of subsection (e) produces the inequitable result of preserving (indeed requiring) PIM's right to receive commissions even where it failed to remit premiums after the date of termination. The District Court, sympathetic to the inequities posed by Ohio Casualty's situation, agreed that the ruling in Department of Insurance v. Universal Brokerage Corp., 303 N.J. Super 405 (App. Div. 1997), supports the policy that a "terminated agent cannot profit from failure to remit premiums after demand therefor even when it occurs after the termination date." Professional Ins. Management, 246 B.R. at 63. Nonetheless, the Court explained that while "[t]his policy statement may well have an effect on the Bankruptcy Court's equitable determinations . . .[,] Universal Brokerage did not interpret subsection (e)" nor could it alter the effect of the statute's plain language. Id. at 63-64. The District Court firmly declared that "this Court is not free to rewrite the statute to preclude that result where the unambiguous language of subsection (e) does not." Id. at 64. The purpose and policy

23

behind this statute -- to preserve the rights of terminated agents and to maintain the benefit of continued service by motivated agents -- support this interpretation. We therefore conclude that the Bankruptcy Court and the District Court correctly read subsection (e) necessarily to apply to the termination of agents as opposed to an agent's conduct independent of termination.

B. Application of the Statute

On appeal, Ohio Casualty claims that PIM's improper credits and failure to turn over commercial premiums from January, 1994 forward was a continuation of the improper

accounting practices and indebtedness for which Ohio Casualty initially terminated PIM. PIM's conduct, therefore, arguably constitutes gross and willful misconduct and the failure to pay over premiums due, thus qualifying as a termination under subsection (e) of the Agency Termination Statute. Moreover, Ohio Casualty advises us that the Agency Termination Statute does not direct how a carrier is to terminate an agent; the agency contract does. According to Ohio Casualty, "the sole purpose of the Statute is to guide the renewals of policies of agents after termination." Ohio Casualty's Br. at 36.

Whether Ohio Casualty's allegations legitimately constituted a reason for termination under subsection (e) was the inquiry that the Bankruptcy Court undertook. In reaching its holding that PIM's termination was effectively at will (i.e., under subsection (d)), the Bankruptcy Court limited its review of the record to the period prior to the date of the notice of termination. In re Professional Ins. Management, No. 94-1312, letter op. at 65 (Bankr. D.N.J. July 12, 1999). "It cannot be disputed that the agency relationship between the debtor and Ohio was terminated by letter dated November 15, 1993. Any indebtedness that arose following the termination will not be considered as a basis for the activation of subsection (e)." It did so because PIM was effectively prevented from writing new business pursuant to the terms of the notice of termination, and because by that time Ohio Casualty's reasons for termination were already fully formed. Professional Ins. Management, 246 B.R. at 64.

The District Court ruled that this limited review was erroneous.18 Although noting that the Bankruptcy Court's "decision to ignore evidence from after November 15, 1993 was based on an incorrect assumption that an agent could not be terminated under both subsection (d) and subsection (e)," the District Court nevertheless found this error harmless. Professional Ins. Management, 246 B.R. at 64-65. In its harmless error analysis, the District Court relied on evidence in the record that Ohio Casualty gave PIM 90-days notice, paid PIM commissions in apparent accordance with subsection (d), and never gave a subsequent notice to PIM (or anyone) that it was terminated for failure to remit premiums. The District Court concluded that there was simply no evidence that Ohio Casualty affirmatively changed the character of the termination between November 15, 1993 and March 1, 1994. Id. at 65.

We agree with the District Court that the Bankruptcy Court's failure to extend its inquiry to PIM's conduct post-November 15, 1993 is error. However, we cannot support the District Court's conclusion that the Bankruptcy Court's error in this matter was harmless under Rule 61 of the Federal Rules of Civil Procedure.19 See In re Barclay

---

18. The District Court distinguished the Bankruptcy Court's equating the

notice of termination to a "practical termination" due to the inability of the agent to write any new business.

> By the very terms of subsection (d) . . . , though the agent is practically "terminated" as of the date upon which the Notice is sent because it cannot write new business, the termination itself does not become effective in less than ninety days (and Ohio Casualty gave slightly more than ninety days notice by listing March 1, 1994 as the effective date). In many instances, there are practical differences beyond the statutory ones as well: even though agents cannot write new business in the ninety day period, they may attempt to move the entire book of business to another insurance company during that time.

Professional Ins. Management, 246 B.R. at 65 n.11.

19. Rule 61 states that

> [n]o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting

25

Industries, Inc., 736 F.2d 75 (3d Cir. 1984) (overturning District Court's harmless error ruling in the context of a Bankruptcy Court's failure to consider factors relevant to the legal determination at issue). The Bankruptcy Court's limited time-frame precludes the application of the correct legal determination made by the District Court, namely that the reasons for terminating an agent can change between the time of notice and the effective date of termination. Consequently, the relevant factual inquiry was not made: whether PIM's conduct post-notice legitimately qualifies as a reason for termination under subsection (e) and whether Ohio Casualty recognized this conduct (not necessarily subsection (e) itself), sometime prior to March 1, 1994, as one of the reasons for terminating PIM. Such an omission appears to us as inequitable.

Contrary to the ruling of the District Court, we conclude that the fact that Ohio Casualty gave PIM 90-days notice and continued its commissions for a period of one year does not automatically place the termination under subsection (d). First, Ohio Casualty was obligated to do so according to its agency contract with PIM. Ohio Casualty continued to renew and pay commissions in accordance with the contract and subsection (d) because, at the time, PIM had not yet taken the improper credits. In addition, Ohio Casualty's employees admitted at trial that they were not aware of subsection (e) when the initial termination notice was sent. Professional Ins. Management , 246 B.R. at 64. The question, however, is not whether Ohio Casualty complied with the Agency Termination Statute when it terminated PIM, but whether the reason Ohio Casualty terminated PIM was one of the reasons listed in subsection (e). Ohio Casualty's knowledge of subsection (e) is irrelevant to answer this question.

a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.

Fed. R. Civ. P. 61.

Furthermore, that Ohio Casualty did not send a subsequent notice of termination to PIM citing the improper credits taken after January, 1994 does not disqualify Ohio Casualty from the protection that subsection (e) affords. In fact, subsection (e) does not contain a notice requirement. The only requirement triggering subsection (e) is that the agent be terminated for one of the reasons listed. We cannot reconcile the District Court's recognition of this fact[20] with its subsequent conclusion that because Ohio Casualty never notified anyone that PIM was being terminated for one of the reasons listed in subsection (e), it therefore by default terminated PIM at will. After Ohio Casualty sent PIM its initial termination notice alleging improper accounting procedures resulting in substantial indebtedness (which, if proved, would satisfy subsection (e)), Ohio Casualty was not thereafter required to re-notify PIM that its increased indebtedness stemming from additional improprieties was yet another reason for the termination. The District Court's expressed concern (when it declared that "an insurance company cannot just decide that an agent's termination is now under subsection (e) without telling anybody; there must be some evidence that the insurance company told someone--perhaps the insureds themselves--that renewals would no longer come through the terminated agent," Professional Ins. Management, 246 B.R. at 65) is not implicated by the facts of this case. Ohio Casualty's continued correspondence with PIM post-termination declaring that premiums were due and payable and documenting the improper credits

---

20. The District Court pointed out this feature of subsection (e):

> Nothing in subsection (e), . . . indicates that a formal Notice of Termination must be sent; an insurance company can terminate an agent immediately upon discovering the agent's gross or willful misconduct or failure to pay over moneys due after receipt of a written demand therefor, without being subject to the agency termination provisions of subsection (d). Because no separate Notice is needed for a subsection (e) termination, and because the subsection (d) termination cannot, by law, be effective for ninety days after the Notice is sent, it is possible that a subsection (d) termination can transform into a subsection (e) termination before the effective date of the subsection (d) termination passes.

Professional Ins. Management, 246 B.R. at 64-65.

effectively put PIM on notice of the reasons for its termination and satisfied any implied notice requirement.21

Because a termination under subsection (d) of the statute can be converted into a subsection (e) termination based on conduct of the agent between the time of notice of termination and the effective date of the termination, and this can occur without formal notice by Ohio Casualty to PIM that a termination under (e) has occurred, the Bankruptcy Court needs to apply this legal determination to the evidence of PIM's improper credits and failure to remit premiums after November 15, 1993, in ascertaining if that conduct is sufficient under subsection (e) to effect PIM's termination as Ohio Casualty's agent and whether Ohio Casualty recognized this conduct, sometime prior to March 1, 1994, as one of the reasons for terminating PIM.22

IV. Conclusion

Accordingly, we vacate the order of the District Court and remand to that Court so that in turn the case may be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

21. In light of the circumstances of this case, which involved the potential morphing of a subsection (d) termination into a subsection (e) termination, we need not decide what notice, if any, must be given in other cases arising under subsection (e) when there is an insufficient basis to find an effective notice.

22. Our disposition of this case makes it premature for us to resolve the question of the availability of the equitable remedies of recoupment and of prejudgment interest, as they would be appropriate only if the Bankruptcy Court rules on remand that the agency relationship remains governed by subsection (d). We express no opinion as to the merits of these determinations, but leave that decision for the Bankruptcy Court in the first instance.

28